JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Marika Kalman, appeals her conviction for theft in violation of R.C. 2913.02 asserting that the trial court erred by denying her motion for acquittal where she maintains the State presented insufficient evidence. For the reasons that follow, we affirm.
 {¶ 2} In her sole assignment of error, defendant contends:
 {¶ 3} "I. The trial court erred by not granting defendant's motion for acquittal pursuant to Crim. R. 29."
 {¶ 4} This assignment of error pertains to the trial court's decision to deny defendant's motion for acquittal. The facts will therefore be construed below in accordance with the applicable standard of review, that provides:
 {¶ 5} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 6} Defendant was indicted for one count of theft with elderly and disabled person specifications. The offense was alleged to have taken place between January 1, 2002 and December 31, 2004. *Page 4 
 {¶ 7} In August 2002, the victim, Alice, had undergone hip replacement surgery and decided to hire defendant to provide her assistance with cooking and cleaning. At that time, the victim, born in 1922, was approximately 80 years old. The victim paid defendant $640 per week plus $300 per week in order to buy things for the victim's house. It was undisputed that the victim needed an additional $48,000 per year in order to pay defendant. Because the defendant preferred to be paid in cash, the victim would write checks out to cash and process them through the bank until the victim's accountant stopped this practice.
 {¶ 8} The victim was financially sound and employed the services of an attorney, an accountant, and a financial advisor.
 {¶ 9} The victim had a history of banking at Huntington and was known by several tellers at her local branch. By all accounts, she was very frugal and rarely withdrew more than $100 at a time. In 2002, defendant began escorting the victim into the bank. The victim would remain in a chair several feet away as the defendant would cash in bonds on her behalf. Prior to this time, the tellers could not recall the victim cashing any bonds. At first, one of the tellers assumed the victim was using the proceeds to pay defendant. However, she became suspicious when they began cashing large sums on a weekly basis, at times as much as $6,000.
 {¶ 10} The bonds were always signed before they entered the bank. Several witnesses described the victim as not appearing to fully comprehend or understand what was transpiring. Sometimes, defendant would cash multiple bonds. The tellers grew concerned with the frequency and amount of cash being retained from the *Page 5 
bond conversions. Several witnesses described the scenario as raising a "flag" in their mind that something was not right. One teller testified that defendant obtained nearly $6,000 in cash on one single occasion and that she recalled the bonds being cashed on a weekly basis.
 {¶ 11} One teller began questioning the defendant why the victim needed so much cash. The defendant first said it was being used for medicine. When the teller suggested medication did not cost $6,000 per week, the defendant became flustered and said it was being given to the church. The victim's accountant, however, testified that the victim made weekly contributions of $25 to her church, through a check that was issued through her accounting firm. The tellers recalled the defendant putting the cash into the victim's purse and then pushing the victim out of the bank in her wheelchair.
 {¶ 12} Another teller, on a different occasion, directly questioned the victim about the cash withdrawals, which caused the defendant to turn red. On one day, the victim agreed with the teller and decided not to cash some bonds which were already signed.
 {¶ 13} In January or February 2003, the victim's son noticed multiple 1099 statements for bonds his mother had cashed. Due to the number of bonds that were cashed, the victim's income for 2003 was over $100,000. This was an increase from the victim's previous years income which was on average between $30,000 and $40,000. According to her son, the victim's house was paid for, her car was paid for, and she paid approximately $266 a month for health care. The significant increase *Page 6 
caused the victim's son to become concerned and he contacted his mother's attorney, accountant, and financial advisor. The accountant began collecting the bills from the victim's house and paid them. In 2004, the accountant closed the victim's safety deposit box and took over the victim's checkbook.
 {¶ 14} A Solon police detective investigated the matter. The defendant told him that she assisted the victim in cashing bonds from 2002 to 2004 and that the victim would put all the cash in a drawer in her house. The record establishes that no one ever located this type of cash in the victim's home. State's Exhibit 46 is a spreadsheet of the subject bond transactions. On 34 occasions, bonds were converted to cash and no amounts were deposited into the victim's Huntington account. While the victim did some home repairs, this did not account for all of the cash proceeds. Further, the victim wrote 69 checks in the exact amount of the defendant's pay, which a reasonable trier of fact could conclude was paid to the defendant. On one occasion, the defendant cashed one of the victim's bonds in the amount of $7,030 at Key Bank and that day made a deposit to defendant's account in the exact amount. The defense argued this money could have been a gift from the victim to pay the defendant's husband's funeral expenses. Although the jury could have construed the evidence in this way, they were not compelled to do so.
 {¶ 15} It was also discovered that the victim had added the defendant's name to enable her access to the safety deposit box. In addition, the victim changed her estate planning documents to name the defendant as her only non-relative beneficiary. Under cross-examination, the victim's attorney stated that he believed *Page 7 
the victim was competent to make the alterations but that she was in a state of confusion over her financial affairs. The attorney also said he had documented in a letter his concern that the defendant was exerting undue influence over the victim. He considered that the situation presented a textbook undue influence case.
 {¶ 16} The victim's son testified that, although he had never done so, he had access to his mother's safety deposit until his name was "suddenly" removed and replaced by the defendant's name.
 {¶ 17} In the fall of 2005, the victim was hospitalized and subsequently diagnosed with moderate to severe dementia. At the request of the victim's family, a psychiatrist performed a mini-mental examination. At that time, the victim was not oriented to place and did not know the date. Her short term memory was impaired. It was unclear when the victim began suffering from dementia. The psychiatrist recalled the victim's "friend" being present, who he had to forcefully request to leave and later found standing outside the door as if listening to everything.
 {¶ 18} Due to her condition and dementia, the victim did not testify at trial.
 {¶ 19} Construing the evidence in a light most favorable to the State, there is sufficient circumstantial evidence from which the jury could conclude that defendant obtained some, or all, of the money in question. Likewise, there is sufficient circumstantial evidence from which the jury could have inferred that defendant obtained some, or all, of the money in question by deception — that includes the testimony of the tellers concerning their observations of the victim as well as the *Page 8 
victim's reputation for being frugal and her attorney's concern of undue influence by the defendant.
 {¶ 20} Defendant's final argument is that the trial court improperly allowed the case to proceed to the jury based upon an impermissible stacking of inference upon inference. The record evidence contains a substantial amount of circumstantial evidence, but this does not preclude the State from establishing the charged offense. State v.Thomas, Cuyahoga App. No. 90623, 2008-Ohio-6148, ¶ 44.
 {¶ 21} "An inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury." State v. Beynum (May 23, 1996), Cuyahoga App. No. 69206, quoting Hurt v. Charles J. Rogers Transp. Co. (1955), 164 Ohio St. 329, paragraph two of the syllabus. In this case, there were parallel inferences supported in part not only by other inferences but also by facts.
 {¶ 22} For instance, the direct evidence establishes that defendant aided the victim in converting a bond in the amount of $7,030, that on the same day the same amount of money was deposited into the defendant's bank account. The facts also establish that the victim was confused about her financial affairs and that she did not seem aware of what was happening when the bonds were being cashed. From this evidence, the jury could permissibly draw parallel inferences, without stacking an inference upon an inference, that would establish the elements of the charged offense. *Page 9 
 {¶ 23} "While the rule prohibiting the stacking of inferences is still recognized in Ohio, the rule is extremely limited. It merely prohibits the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts. But the rule does not forbid the use of parallel inferences in combination with additional facts. Nor does it prohibit the drawing of multiple inferences separately from the same set of facts. Because reasonable inferences drawn from the evidence are an essential element of deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited." Sellers v. Whitt (Nov. 3, 1993), Greene App. No. 91 CA 96; see, also, Thomas, supra, ¶ 44-45.
 {¶ 24} When the evidence is construed in a light most favorable to the State, the trial court did not err by submitting the case to the jury.
 {¶ 25} Defendant's sole assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. *Page 10 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 KENNETH A. ROCCO, P.J., and MARY J. BOYLE, J., CONCUR. *Page 1