[Cite as *State v. Agee*, 2013-Ohio-5382.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    12 MA 100 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| KEVIN AGEE, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Criminal Appeal from Common Pleas Court, Case No. 10CR1135. |
| JUDGMENT: | Affirmed in part; Remanded for Resentencing. |

APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellee: | Attorney Paul J. Gains<br>Mahoning County Prosecutor<br>Attorney Ralph M. Rivera<br>Assistant Prosecuting Attorney<br>21 West Boardman Street, 6th Floor<br>Youngstown, Ohio  44503 |
| For Defendant-Appellant: | Attorney Timothy Young<br>Ohio State Public Defender<br>Attorney Kenneth Spiert<br>Attorney Valerie Kunze<br>Assistant Ohio Public Defenders<br>250 West Broad Street, Suite 1400<br>Columbus, Ohio  43215 |

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  December 4, 2013

VUKOVICH, J.

**{¶1}** Defendant-appellant Kevin Agee appeals from his convictions of murder, attempted murder, and felonious assault entered in the Mahoning County Common Pleas Court. He first contends that the court erred in permitting the state to introduce evidence of drugs, guns, and ammunition unrelated to this crime that were confiscated during the execution of the search warrant at his house and to introduce as demonstrative evidence a rifle said to resemble the murder weapon. Appellant also argues that there was insufficient evidence as to his complicity in the shooting and that finding him complicit was contrary to the manifest weight of the evidence. These arguments are overruled. The murder conviction for the death of Thomas Repchic is upheld.

**{¶2}** However, appellant's merger argument has merit. The attempted murder and the felonious assault offenses committed against Jacqueline Repchic should have been merged at sentencing as there was no separate animus for each offense. The case is thus remanded for resentencing on either attempted murder or felonious assault as elected by the state.

STATEMENT OF THE CASE

**{¶3}** Appellant's friend, Aubrey Toney, was involved in an ongoing feud with two individuals nicknamed Piru and OB. It seems that Piru believed Aubrey Toney shot at his house, and Aubrey Toney believed that Piru retaliated by shooting up his car. Aubrey Toney also believed that he was once arrested due to Piru snitching on him. And, Aubrey Toney was upset that OB punched him in the back of the head at a gas station, causing him to suffer migraines. OB was known to drive a burgundy 1990 Cadillac DeVille that was described as "old school" and "flashy." (Tr. 178, 482).

**{¶4}** On September 25, 2010, Aubrey Toney was at a little league football game with appellant Kevin Agee when he received a call from his female cousin sometime around the noon hour, stating that Piru was across the street from Toney's father's house on Ferndale Avenue. His male cousin got on the phone as well to ask about the Piru situation. Aubrey Toney and appellant soon arrived at the female

cousin's house on Hilton Avenue and borrowed her reddish or burgundy Dodge Durango, leaving the small car Toney had been driving at her house.

{¶5}    When the male cousin learned that Aubrey Toney borrowed the Durango, he was concerned and called Toney who advised that he would have to call him back because he has "dibs on somebody now." (Tr. 375). Appellant Kevin Agee drove the Durango with Aubrey Toney in the passenger seat. At some point, appellant drove down Southern Boulevard and turned down a short dead-end portion of Philadelphia Avenue. He then turned around and stopped at the stop sign at Philadelphia Avenue and Southern Boulevard.

{¶6}    In the meantime, around 1:00 p.m., Thomas Repchic, age 74, was sitting in his burgundy 1990 Cadillac DeVille outside of St. Dominic's church, on the corner of Southern Boulevard and Lucius Avenue waiting for his wife, who worked as a secretary at the church. Jacqueline Repchic, also 74, got in their Cadillac, and they proceeded north on Southern Boulevard.

{¶7}    As the Cadillac approached the Durango at Philadelphia Avenue, Aubrey Toney wrested a large .308 rifle from next to his seat and fired seven shots into the Repchic vehicle. One shot went through the passenger door and took off Mrs. Repchic's right foot; her other foot was also injured by bullet fragments. (Tr. 56-57). Another shot went through the back of the driver's seat and killed Mr. Repchic by entering his lung and heart. Mrs. Repchic reached over and steered the car into the curb just before the busy y-junction at Market Street.

{¶8}    The City of Youngstown's Shotspotters system triangulated the seven shots it heard as occurring near the Southern Boulevard and Philadelphia Avenue intersection and transmitted this information to its patrol cars. Officers followed a blood trail leading from the car toward the intersection where they found a fired .308 cartridge in the middle of the street.

{¶9}    The police interviewed witnesses near that area who saw a red Durango go down the street and saw gun smoke near the Durango after the shots were fired. The Durango was also seen on various security cameras at the time of the shooting. A witness said the passenger was a dark-skinned black male with short

hair and the driver was a lighter-skinned black male with a bushy ponytail. (Tr. 96). Appellant was a lighter-skinned black male with long dreadlocks, and Toney's female cousin stated that the person with Toney, whom she believed would be driving her car that day, had his hair "locked up." (Tr. 174, 381, 460).

{¶10} Aubrey Toney returned the Durango to his cousin 20-35 minutes after he borrowed it. (Tr. 175). Later that evening, Aubrey Toney apologized to her for putting her in the middle of his feud and gave her money to stay in a hotel. (Tr. 177, 184, 199). The police canvassed the area and spoke to each person who owned a Durango. Aubrey Toney's cousin initially denied that she loaned out the vehicle, but she soon admitted that she loaned him the vehicle at the time of the shooting and told police what she knew about the feud.

{¶11} Aubrey Toney's male cousin also spoke to police about the feud and about Aubrey's statements to him on the phone around the time of the shooting, such as that he "had dibs" on someone. And, in the second call, Toney stated, "I think I got him." (Tr. 375, 405, 418). This male cousin also told the police that appellant Kevin Agee was involved and opined that the gun would be found in appellant's garage, describing a house on Garfield Street. (Tr. 381-383).

{¶12} On September 28, 2010, the police executed a search warrant at the house on Garfield just as appellant was exiting the house. They found an unfired .308 cartridge on the living room bookshelf. A BCI agent testified at trial that this unfired cartridge had been cycled through a gun and had extractor marks that matched the fired cartridge found at the scene of the shooting. The police also seized guns, other ammunition, bullet proof vests, crack cocaine, drug paraphernalia, and a ball cap with a red C on it which matched the description of the hat worn by one of the occupants of the Durango.

{¶13} When appellant was interviewed by police, he initially stated that he saw Aubrey Toney at the game but left with someone else and that he was not present during the shooting. (DVD Tr. 14-15, 27, 30, 32-33). He stated that Aubrey Toney is one of his closest friends, that he loved him, that Aubrey was constantly at his house, and that they often got high together. (DVD Tr. 19-20, 26, 32, 61). He

knew of Aubrey Toney's feud with Piru and OB, and he knew that OB had a car like the one on the news. (DVD Tr. 9-14). Regarding the unfired .308 cartridge, he stated that Aubrey Toney had a very long gun at his house one night, that he heard Aubrey making metallic "clacking" noises with it, and that Aubrey must have left some .308 ammunition behind. (DVD Tr. 16, 35, 60).

{¶14} Appellant's grandmother then spoke to him. She stated that security cameras on the streets showed him driving the vehicle and said that the hat described by a witness was found in his house. (DVD Tr. 63, 65). She disclosed that an eyewitness described one person as darker-skinned and the other as lighter-skinned. (DVD Tr. 65). She advised him to say he was driving but that he was in the wrong place at the wrong time, urging that he did not owe the shooter anything. She said she did not believe he knew what the shooter was going to do when he saw that car. (DVD Tr. 64). They then spoke of what it meant to be an accessory. (DVD Tr. 71-72). Appellant's mother entered and told him that Piru was watching her house. (DVD Tr. 77). His mother also told him that Aubrey Toney's female cousin worried that someone they knew was talking to police. (DVD Tr. 81). His relatives then left the room, and the detectives reentered.

{¶15} At that point, appellant admitted that he had been driving the Durango when Aubrey Toney fired at the Cadillac. Appellant explained that he left the game with Toney and they switched from the small black Dodge Caliber that Toney was driving to the Durango because it was bigger. (DVD Tr. 88, 97). He denied seeing the big gun in either car. (DVD Tr. 88, 98). Appellant said that he drove the cousin's car because he had a license. He insisted that he did not expect Aubrey Toney to shoot at a car and that his only plan was to drive around while drinking and smoking weed. (DVD Tr. 87-88, 111).

{¶16} Appellant stated that they were about to stop at a house to buy weed but the man they were meeting was not there yet so he turned around. (DVD Tr. 106). He explained that while he was at the stop sign, Aubrey Toney wrestled with the gun to bring it out of the window and then he started shooting. (DVD Tr. 90-92,

122). Appellant said that he did not have a "beef" with anyone and denied that there was talk of Aubrey Toney's feud in the car before the shooting. (DVD Tr. 108, 133).

{¶17} When his relatives were permitted in the interrogation room again, appellant made some phone calls. During one call, he talked about someone telling everything to the police and said, "Tell every fucking body, man. We gotta -- you all squeeze that mother fuckin' rat." (Tr. 158). Appellant was then booked into the jail. He and Aubrey Toney were soon indicted for aggravated murder with a death specification for the death of Thomas Repchic. Regarding Jacqueline Repchic, they were indicted for attempted murder, felonious assault (deadly weapon), and felonious assault (serious physical harm). All four counts carried firearm specifications.

{¶18} Appellant's case was tried to a jury. The state presented the testimony of the police officers, detectives, and BCI agents involved in the case, two neighbors from the area of the shooting, a 911 dispatcher, a Shotspotters representative, two priests, the medical examiner, and Aubrey Toney's male and female cousins. The jury watched the DVD of appellant's time in the interrogation room, including his two statements to police.

{¶19} The defense presented expert testimony that disagreed with the BCI agent's testimony regarding matching extractor marks, as he opined that it could not be concluded that the live cartridge and the fired cartridge had been cycled through the same gun. (Tr. 592-593). It was stipulated to the jury that appellant had been legally blind in his right eye since 1994. (Tr. 602).

{¶20} On April 4, 2012, the jury found appellant guilty of the murder, but not the aggravated murder, of Thomas Repchic. The jury found appellant guilty of all three counts involving Jacqueline Repchic and all four firearm specifications. At sentencing, the state agreed that the two counts of felonious assault committed against Jacqueline Repchic would merge with each other. The state argued that the remaining felonious assault would not merge with the attempted murder of the same victim because the evidence shows that Jacqueline was shot in the leg and the shooter then continued to fire shots at the vehicle after it drove past so that her life remained in danger after she was shot. (Sent. Tr. 6-7). The defense countered that

the remaining felonious assault would merge with the attempted murder as there was no separate animus for each offense against the same victim. (Sent. Tr. 9).

{¶21} In a May 23, 2012 sentencing entry, the court imposed fifteen years to life for murder plus three years for the attached firearm specification, ten years for attempted murder plus three years for that attached firearm specification, and eight years for one count of felonious assault (merging one felonious assault into the other and merging both firearm specifications attached to the felonious assaults into the other two firearm specifications). The sentences were run consecutive for a total sentence of 39 years to life. Appellant filed a timely notice of appeal.

ASSIGNMENT OF ERROR NUMBER ONE

{¶22} Appellant sets forth four assignments of error, the first of which provides:

{¶23} "The trial court erred when it admitted irrelevant and prejudicial evidence and thus denied Kevin Agee his rights to due process and a fair trial." (Citations omitted.)

{¶24} Under this assignment of error, appellant contests the admission of a .308 rifle used as demonstrative evidence. He also contests the admission of guns, ammunition, and drugs found in the search of his residence, stating that the only relevant evidence introduced from the search was the unfired .308 cartridge. He urges that the admission of this evidence was irrelevant in violation of Evid.R. 401 and 402, any probative value was substantially outweighed by the danger of prejudice and confusion of the issues in violation of Evid.R. 403, and improper other acts evidence was used to suggest he was a dangerous criminal in violation of Evid.R. 404(B).

{¶25} Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401. Relevant evidence is admissible unless prohibited by another rule, statute, or the constitution. Evid.R. 402. Evidence which is not relevant is not admissible. Evid.R. 402. Although relevant, evidence is not admissible if its probative value is

substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A).

{¶26} We begin with the State Exhibit 134, a .308 rifle the state used as demonstrative evidence. This was a rifle purchased during a controlled buy in Portage County. As .308 rifles are not common, Portage County contacted Youngstown regarding the Repchic shooting. A Youngstown police officer testified that he went to Portage County to test-fire the weapon and retrieved it later for retesting by BCI. (Tr. 163, 166).

{¶27} A BCI agent had concluded that the Portage County weapon was not the gun used to fire the cartridge found at the scene. (Tr. 315). He decided to conduct his own test-fire of the Portage County .308 rifle with the exact brand of ammunition used in the shooting to see if the officer's use of a different brand of ammunition affected the breech pattern. (Tr. 315). The second test-fire also came back as negative for a match. (Tr. 316).

{¶28} As the rifle was not related to this shooting, appellant urges that it was irrelevant and prejudicial. Initially, we note that no objection was entered when the .308 was first introduced during the testimony of the officer who test-fired the weapon. (Tr. 162-166). By the time an objection was entered during the BCI agent's introduction of the .308, the item had already been introduced without objection. (Tr. 314). Error may not be predicated upon a ruling that admits evidence unless the party opposing the admission timely objects. Evid.R. 103(A)(1). We note that the matter was not raised by the defense in the motion in limine. The court did address the matter in its judgment entry thereon (as it was raised in the state's response), but a motion in limine or ruling thereon does not preserve an objection.

{¶29} Regardless, demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 401, it is substantially similar to the object or occurrence that it is intended to represent, and it is not violative of Evid.R. 403. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 82. The admission of demonstrative evidence is within the trial court's sound discretion. *State*

*v. Herring,* 94 Ohio St.3d 246, 255, 762 N.E.2d 940 (2002); *State v. Palmer*, 80 Ohio St.3d 543, 564-566, 687 N.E.2d 685 (1997).

**{¶30}** Thus, the Supreme Court has permitted the state to introduce a .22 caliber revolver as a demonstrative exhibit where the jury was instructed that the gun was similar to but not the actual gun used in the murder and was advised that it was being used for the limited purpose to show that the method of firing entailed pulling back the hammer to cock the gun. *Id.* at 565-566 (with an instruction that the energy needed to pull the trigger may be different). The Court stated that the handgun was relevant to intent, purpose, prior calculation design, and absence of mistake or accident. *Id.* at 566, upholding this court's decision in *State v. Palmer*, 7th Dist. No. 89-B-28 (Aug. 29, 1996) (where we held that state can introduce a handgun as a "model" to show that the type of gun used in the murder required a certain process to be fired to refute a claim that the gun accidentally fired).

**{¶31}** Here, a .308 firearm was used to shoot the victims. A fired .308 cartridge was found in the middle of the street where witnesses put the vehicle from which the shots were fired. An unfired .308 cartridge was found in appellant's house, which had extractor marks said to match those on the fired cartridge.

**{¶32}** In maintaining his defense that he was not aware of the plan to shoot at Piru or OB, appellant insisted that he did not see the gun until Aubrey Toney pulled it out just prior to shooting. (DVD Tr. 105). The state wanted to rebut this claim by showing how big a .308 rifle is in order to suggest that appellant had to have seen the gun being transferred from the small car into the Durango or had to see it in the front of the Durango.

**{¶33}** Testimony established that a .308 rifle is a rare weapon to encounter on the streets; it was said to be shoulder-fired, high-powered, and at least semi-automatic. (Tr. 152-153, 310, 312, 318, 512). A detective who owned a .308 rifle described the ammunition as big caliber or big bore that is very loud and very powerful with a lot of powder and a big "blowup" and which was mostly used in light machine guns, big hunting rifles, or police sniper rifles. (Tr. 152-153). Witnesses testified to a large amount of gun smoke around the Durango during the shooting.

**{¶34}** The BCI agent recited the FBI-generated list of firearms that could fire the cartridge, and the type in State Exhibit 34 was on the list. (Tr. 313, 316). He stated that all of the rifles on the list eject the cartridge and reload another upon firing. (Tr. 318-319). He noted that the cartridge showed fluted chamber marks which occur only with a semiautomatic or above and not with a bolt action or manual ejection firearm. (Tr. 310).

**{¶35}** Moreover, appellant admitted that Aubrey Toney previously had a "big ass" .308 at appellant's house and that Aubrey Toney left the .308 cartridge there. (DVD Tr. 16, 35). He indicated that Aubrey Toney was "clacking" the metal parts of his gun one night, which suggests this is when the unfired cartridge was cycled through the gun.

**{¶36}** Appellant also variously described the gun as "pretty big," "big ass," and "pretty fucking long." (DVD Tr. 60). Appellant stated that he did not know that "big motherfucker" was wedged in the front of the Durango when he got in. (DVD Tr. 88). He also stated that Aubrey Toney had to wrestle with the gun to bring it up to the car window. (DVD Tr. 122). In addition, he mentioned that Toney rested it all the way out between the mirror and the door.[1]

**{¶37}** The trial court could reasonably find that State Exhibit 134 was substantially similar to the .308 rifle used in the shooting. In order to show just how big a .308 rifle is and thus help rebut appellant's defense, the state could properly admit a .308 rifle. The state wanted to show that appellant knew the gun was in the vehicle and that they switched from a small car to a large SUV specifically to utilize the large gun in their pursuit of Piru and OB. The state notes that the laughter heard by witnesses coming from the Durango as it drove down the road just before the shooting combined with appellant's statement that Aubrey Toney had to wrestle with the gun to get it out the window suggests that they were laughing about Aubrey Toney's struggle with the weapon.

---

[1]The defense questioned witnesses about whether they ever heard of a .308 pistol. They did not, and it was not in the list generated from the FBI database on guns that could fire the .308 cartridge recovered. (Tr. 155, 334). Regardless, appellant's statement described a large rifle, not a handgun.

{¶38} We have viewed the .308 rifle identified as State Exhibit 134. It is nearly three and a half feet in length. Besides being very long, it is bulky. The butt of the stock is wide. Even wider is the distance from the bottom of the grip to the top of the barrel, which appears to span more than 8 inches. Upon seeing such a representation of a .308 rifle, a person can tend to disbelieve appellant's claim that he did not notice the gun in the front of the Durango until Aubrey Toney pulled it out seconds before shooting or that he did not see Aubrey Toney load the rifle into the Durango after he borrowed it. Thus, it was relevant. *See, e.g., Jones*, 135 Ohio St.3d 10 at ¶ 84-96.

{¶39} There is no indication that the introduction of the .308 rifle as demonstrative evidence would confuse or mislead the jury. *See, e.g., Jones*, 135 Ohio St.3d 10 at ¶ 110. A police officer, a detective, and a BCI agent all testified that State Exhibit 134 was not the actual .308 rifle used in the shooting. (Tr. 167, 315-316, 513). And, the court gave a demonstrative evidence instruction *formulated by both sides*, which explained that demonstrative evidence is an object, picture, model, or other device intended to clarify or qualify facts for the jury, that such evidence is merely an aid in understanding certain facts, and that it is up to the jury to decide what weight to give such evidence. (Tr. 560, 651-652). Also notable here is that this particular piece of demonstrative evidence was actually scientifically excluded as the murder weapon by the state's witnesses, lessening any confusion and adding to background investigation relevance.

{¶40} Finally, evidence against a defendant is meant to be prejudicial; it is only unfair prejudice that concerns the court and only unfair prejudice that can substantially outweigh the probative value. *See* Evid.R. 403(A). The probative value of the demonstrative evidence here was high. We find that the trial judge could reasonably conclude that the probative value of the demonstrative evidence was not substantially outweighed by the danger of unfair prejudice. We refuse to substitute our judgment for that of the trial court on this matter as the decision was not unreasonable, arbitrary, or unconscionable. *See, e.g., Jones*, 135 Ohio St.3d 10 at ¶ 82; *Herring*, 94 Ohio St.3d at 255.

**{¶41}** We now turn to the introduction of the evidence relating to guns and drugs (besides the unfired .308 cartridge for which no argument is or could be made). An officer testified that, during the search of appellant's residence at 537 Garfield Street, he discovered the following items in the following locations: from a cigar box, a pipe, suspected cocaine, and live and spent cartridges; from beside the living room couch, a 12-gauge shotgun; from the garage rafters, two magazines; from the living room hutch, two bullet proof vests; from the top of the refrigerator, a .9mm; from the attic, a .30 caliber, a .9mm, a 12-gauge shotgun, and a bag containing ammunition and a pistol magazine. (Tr. 244-245).

**{¶42}** The officer identified photographs depicting this evidence, and the evidence was then itself admitted. (Tr. 246-257). A detective testified that he recovered the following items from the kitchen during the search: crack cocaine, a digital scale, and black Ziploc baggies. (Tr. 457). He also recovered marijuana on appellant's person during the arrest. (Tr. 458).

**{¶43}** Objections were entered during the testimony of these two witnesses. (Tr. 244, 456, 458). As the officer began to testify about these items, the defense objected by referring back to the mid-trial motion in limine which had been overruled. (Tr. 244). The motion in limine asked to prohibit the admission of firearms, ammunition, and cocaine recovered in the search and not used in the murder. The motion raised relevance and degree of prejudice and argued that the state was trying to convict him by association with nefarious objects. (03/28/12 Motion In Limine).

**{¶44}** The state responded that the police were told that appellant's house is where Aubrey Toney and appellant kept their guns and a .308 cartridge was in fact found there. The state argued that the evidence of guns and ammunition is relevant to appellant being the provider of the murder weapon, besides allowing his house to be used for its storage. As for the drugs, the state responded that the discovery of 8 packets of crack cocaine individually wrapped for sale on appellant's table put into question appellant's claim that he drove to Philadelphia Avenue to meet with a marijuana dealer so that they could drive around and smoke marijuana.

**{¶45}** The court's judgment entry denying the motion in limine concluded that the opening statement of the defense raised the issue of appellant looking for drugs, thus opening the door for the state to rebut that story with the introduction of the cocaine. (*See* Tr. 37). As to the guns, the court agreed that they could be admitted to rebut appellant's claims that he was not part of any dispute, that he had no idea what was going on, and that he was merely a witness with no intention of harming anyone. (03/29/12 J.E.).

**{¶46}** Appellant urges that since he was not charged with offenses related to these items, they were irrelevant, overly prejudicial, and improper other acts evidence. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

**{¶47}** It can also be used to respond to arguments already raised, such as to bolster credibility after an attack thereon or to delve into a line of inquiry already raised. *See, e.g., State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 75-78. The state contends that the evidence from the search was not used to show appellant's character but was used to outline the methods of investigation to establish that the police conducted a thorough investigation. The state also notes that the relevancy test does not require the evidence to directly prove an element of the offense. *See State v. Tapscott*, 7th Dist. No. 11MA26, 2012-Ohio-4213, ¶ 23.

**{¶48}** As to the bulletproof vests, appellant told police that Aubrey Toney wore a bulletproof vest for protection, that he left it at appellant's house, and that he sometimes forgot to wear it when they got high. (DVD Tr. 114). Appellant stated that Aubrey Toney had a feud with Piru and OB and insisted that he was not involved in the feud. As Toney was said to wear a vest as protection against the feud, the fact that two vests were found in appellant's house is pertinent to the question of whether appellant was affected by or involved in the feud. It is not unfairly prejudicial or

improper other acts evidence. It confirms a statement of appellant while also rebutting a key claim of his defense and constitutes evidence of knowledge of the feud and even preparation for involvement in that feud.

**{¶49}** As for the guns and ammunition found in appellant's house, these items were not alleged to be used in the shooting. The Supreme Court has suggested that other firearms are not admissible merely to show a defendant had access to guns where those guns are not said to be the murder weapon. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 107. That Court did find some merit to the state's contention that a cache of weapons found in a suspect's home can be introduced to show familiarity with weapons in a case where the defendant claimed that he accidentally pulled the trigger on a different weapon. *Id.* at ¶ 110. The Court alternatively stated that the admission would have been harmless due to overwhelming evidence of appellant's guilt. *Id.* at ¶ 111 (a death penalty case).

**{¶50}** Here, the guns and ammunition were found in appellant's house where a .308 cartridge was also discovered. Appellant admitted that he was the driver during the shooting with a .308 and admitted that said rifle and its ammunition had previously been in his house. The ammunition magazines found in the rafters of appellant's garage bolstered the credibility of Aubrey Toney's male cousin, who told police that the murder weapon was likely in the rafters of appellant's garage. That witness told police that Aubrey Toney and appellant both kept guns at appellant's house. (Tr. 488-489). The guns and related evidence tend to show that appellant supplied or at least stored the murder weapon in which case he would be more aware of its removal prior to the shooting rather than a mere innocent driver.

**{¶51}** Moreover, appellant admitted that his house was Aubrey Toney's "safe spot" when he was "beefing." (DVD Tr. 56). He had a security system set up on a monitor showing four views of the exterior of his house. (Tr. 491). Notably, the shotgun lying in the open right next to appellant's living room couch, the same room containing Aubrey Toney's bulletproof vest, the security monitors, and the unfired .308 cartridge (with extractor marks matching those made by the murder weapon), could be seen as evidence that appellant was involved in the feud at issue due to his

friendship with Aubrey Toney. And, the choosing of this gun over the other available weapons could show intent to kill as opposed to scare, especially considering how unwieldy the gun is and in combination with the switching to a larger vehicle prior to the shooting.

{¶52} Although alone each of these theories may be insufficient support for the admission of the guns and ammunition, using a combination of all of the elements existing here, we conclude that the guns and ammunition found in the same house as the .308 cartridge were relevant and admissible to rebut appellant's defense, which revolved a claim that he was not involved in the shooter's feud with Piru and OB and to show that he had a plan in place to protect himself against the feud and/or further it. The probative value of this evidence was not substantially outweighed by dangers of unfair prejudice, especially considering that appellant had admitted that the .308 was present in his house before the shooting (and that Aubrey Toney even utilized it in his house in a manner that produced a "clacking" of metal sound).

{¶53} The drugs and paraphernalia found in appellant's house tend to rebut appellant's claim that he was driving around Philadelphia Avenue, not in search of the red Cadillac, but in order to meet a marijuana dealer whom he allegedly needed Aubrey Toney to find for him because he could not find any himself. (DVD Tr. 101-102). Notably, Aubrey Toney's cousin testified that he originally met appellant one night, when he and Aubrey Toney went to the house on Garfield t*o buy marijuana off appellant*. (Tr. 379-380).

{¶54} Appellant insisted to police that his point in driving around with Aubrey Toney was to drink, do pills that he already possessed, find marijuana from Toney's dealer, and then return to appellant's house to watch a game together. That drugs and tools for not only drug-using but also for drug-distributing were found in his house is relevant and probative to an evaluation of the credibility of his defensive claims.

{¶55} Appellant made these claims in his statement to police, which was introduced by the state at trial. These claims were also made in the defense's opening statement. The Supreme Court has concluded that after the defense raised

the subject of defendant's drug use in opening statements, "the topic became open to all relevant inquiry in the discretion of the trial court". *State v. Kamel*, 12 Ohio St.3d 306, 312, 466 N.E.2d 860 (1984). Under the particular facts of this case, we overrule the argument regarding the admission of the drugs discovered during the search of appellant's residence. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

**{¶56}** The text of appellant's second assignment of error states:

**{¶57}** "The trial court erred when it failed to merge the allied offenses of attempted murder and felonious assault." (Citations omitted.)

**{¶58}** As aforementioned, the jury found appellant guilty of three counts involving Jacqueline Repchic: attempted murder, felonious assault with a deadly weapon, and felonious assault by causing serious physical harm. The court merged the two felonious assaults but refused the defense's request to merge the remaining felonious assault with the attempted murder count. Appellant argues that felonious assault must be merged with attempted murder of the same victim as (1) they can be committed by the same conduct and (2) the offenses against Mrs. Repchic were committed during a single act with a single state of mind.

**{¶59}** Where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. R.C. 2941.25(A). Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the defendant may be convicted of all of them. R.C. 2941.25(B).

**{¶60}** Thus, there is a two-part test to determine if offenses should be merged. First, the elements of the two crimes are compared. *State v. Williams*, 134 Ohio St.3d 482, 983 N.E.2d 1245, ¶ 17, citing *State v. Blankenship*, 38 Ohio St.3d 116, 117, 526 N.E.2d 816 (1988). The elements of the two offenses were previously considered only in the abstract but are now compared in the factual context of the defendant's conduct. *Id.* at ¶ 20; *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-

6314, 942 N.E.2d 1061, syllabus, where a majority overruled *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999). If the crimes correspond to a sufficient degree, then crimes are allied offenses of similar import and the court must proceed to the second step. *See Williams*, 134 Ohio St.3d 482 at ¶ 17.

**{¶61}** In the second step, the defendant's conduct is also reviewed, and only if the crimes were committed separately or there was a separate animus for each crime (or they are of dissimilar import under the first prong) can the defendant be sentenced for both. *See id.* at ¶ 17, 21. In reviewing a trial court's merger decision, the appellate court conducts a de novo review of the trial court's application of the law to the facts. *Id.* at ¶ 27-29.

**{¶62}** Thus, as the reviewing court, we first determine "whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other." *Johnson*, 128 Ohio St.3d 153 at ¶ 48 (Brown, J., plurality); *State v. Williams*, 7th Dist. No. 10MA136, 2012-Ohio-5344, ¶ 29 (applying plurality). *See also State v. Helms*, 7th Dist. No. 08MA199, 2012-Ohio-1147, ¶ 26 (*Helms II*), citing other districts that adopted the *Johnson* plurality. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Johnson*, 128 Ohio St.3d 153 at ¶ 48 (Brown, J., plurality). Due to the subjective nature of the analysis based on the facts of each case, some crimes may be allied offenses in certain cases, but not in another case under a different set of facts. *Id.* at ¶ 52.

**{¶63}** Here, the state does not dispute that the attempted murder and felonious assault charges can be committed with the same conduct under the first prong of the merger test. *See Helms*, 7th Dist. No. 08MA199 at ¶ 28 (attempted murder and felonious assault can be committed with the same conduct as "[t]he conduct of pointing and shooting a gun at a person or persons can result in the death of one or more individuals, and the same conduct can also fall short of causing death but can cause physical harm"). That is, knowingly causing or attempting physical harm with a deadly weapon or knowingly causing or attempting serious physical harm

can be committed when one attempts to murder someone (using a gun in this case) and vice versa.

**{¶64}** Thus, the issue here is whether the two offenses were committed separately or with separate animus. Animus means "purpose, or more property, immediate motive" and can be inferred from the surrounding circumstances. *State v. Logan,* 60 Ohio St.3d 131, 397 N.E.2d 1345 (1979).

**{¶65}** In *Helms II*, we found the crimes were committed separately with a separate animus where the attempted murder was committed when the defendant shot the victim in the neck from behind with intent to rob and the felonious assault was committed separately when the defendant thereafter, pushed the car to a more secluded spot, rummaged through the victim's car looking for money, took the deposit money from the victim, and threatened to shoot the victim in the head while asking the location of the rest of the money. *Id.* at ¶ 4, 29. We also noted that if the initial conduct of shooting the victim in the neck were the only facts, then there would be no question that the two offenses would merge. *Id.* at ¶ 29.

**{¶66}** The Eighth District found separate and distinct acts entailing a substantial independent risk of harm to support convictions for both felonious assault and attempted murder where the defendant (who claimed self-defense) shot the victim in the abdomen, causing the victim to fall to the elevator floor, and then attempted to shoot the victim multiple times while following him out of the building. *State v. Hines*, 8th Dist. No. 90125, 2008-Ohio-4236, ¶ 47.

**{¶67}** And, the Ninth District has stated that a defendant's acts of shooting the victim in the elbow to disable him and then (after the victim disclosed he was a police officer) attempting to shoot the victim point-blank in the head show separate animus for felonious assault and attempted murder. *State v. Nichols*, 9th Dist. No. 24900, 2010-Ohio-5737, ¶ 62. *See also State v. White*, 10th Dist. No. AP-34, 2011-Ohio-2364, ¶ 67 (separate animus for felonious assault and attempted murder where defendant was shot once in back and once in face as he lay on floor); *State v. Monford*, 190 Ohio App.3d 35, 940 N.E.2d 634, 2010-Ohio-4732, ¶ 128-129 (separate animus where a victim suffered two gunshot wounds and there was

testimony that defendant shot her while she was near a pole and he then fired another shot as she tried to run to the bathroom).

{¶68} The state argued to the trial court that one of the first shots hit Mrs. Repchic's foot resulting in felonious assault and that by continuing to fire into the vehicle, there was a separate incident of or animus for attempted murder. In their response brief, the state urges that the mere existence of multiple shots can be used to establish a separate animus, citing *Nichols*, *Monford*, and *White*.

{¶69} Appellant urges that Mrs. Repchic was subjected to a single threat of harm from one shooting incident. He suggests that there is no indication that the offenders knew they failed to kill the passenger so they kept shooting at her or that there were separate aiming events. It is noted that there was no showing of separate motive for the second shot as in *Nichols* for instance. Appellant concludes that there was but one animus per victim.

{¶70} As appellant argues, his case is distinguishable from cases such as *Helms* as there are not two separable scenarios that occurred here. Moreover, the state suggested at oral argument that Mrs. Repchic suffered two bullet wounds; however, the testimony was that there was one bullet hole in the passenger door. Mrs. Repchic testified that a bullet essentially took off her foot and mentioned that the other foot was injured by bullet fragments, but this testimony did not suggest to us that she was hit by two different shots, one per foot. (Tr. 56-57).

{¶71} Here, Shotspotters detected seven shots spanning 4.8 seconds. (Tr. 446). At least six possibly all seven shots hit the Repchic vehicle. There was a hole in the passenger door corresponding to Mrs. Repchic's gunshot wound. Due to the path of the car moving past the vehicle containing the shooter, it can be concluded that this was the first shot to strike the vehicle. Then, there were four holes in the rear quarter panel or fender area. A bullet also hit the rear window frame, causing the rear window to shatter. And, Mr. Repchic was shot through the back of the driver's seat. (Tr. 468).

{¶72} The intent was to kill the two people in the Cadillac. One was killed; the other was hit. There is no dispute that these two shootings of two victims should be

represented by separate sentences. However, where one bullet hits a victim and other bullets miss that same victim, there is no per se separate act or separate animus, and where these are the only facts, merger is required.

**{¶73}** This was the position of the Eighth District in a recent case where the trial court sentenced the defendant for: attempted murder and two felonious assaults for victims one and two (both of whom suffered head injuries) and attempted murder, felonious assault, and attempted felonious assault for victims three and four, for a total of 12 sentences for the act of firing multiple shots into a vehicle containing four occupants. *State v. Phillips,* 8th Dist. No. 96329, 2012-Ohio-473. The appellate court reversed stating that multiple offenses were committed by the same conduct, concluding that firing gunshots into the car was one act as to each victim and remanding for election by the state as to which count per victim it would proceed on. *Id.* at ¶ 49-50, 52. *See also State v. Bolan*, 8th Dist. No. 95807, 2011-Ohio-4501, ¶ 3, 37-39 (attempted murder and felonious assault as to the surviving victim would merge where a defendant fired six shots at two people).

**{¶74}** We likewise conclude that the record here shows only a single animus to shoot up a vehicle, which animus branched for each victim but not for each offense that was charged regarding the same victim. Thus, under the particular circumstances of the case before us, felonious assault and attempted murder as to the same victim should have been merged. Some of those particular circumstances include the fact that seven shots were fired at a car containing two people from a person in another car using a .308 rifle in a span of 4.8 seconds and the defendant at issue was not the shooter.

**{¶75}** While the jury was permitted to return verdicts for both felonious assault and attempted murder as to Mrs. Repchic, the state had to thereafter elect which offense would proceed to sentencing, and the trial court could only sentence appellant on one of the offenses against Mrs. Repchic. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 17-24 (defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses as elected by the state). We thus reverse and remand for

resentencing where the state can elect whether it wishes to proceed to sentencing on attempted murder or felonious assault with regards to the passenger.

ASSIGNMENT OF ERROR NUMBER THREE

**{¶76}** Appellant's third assignment of error contends:

**{¶77}** "The State presented insufficient evidence to prove that Kevin Agee knew about and joined with Aubrey Toney's plan to kill Toney's rivals and that he shared Toney's purpose to kill. Therefore, [his convictions violated his] rights to due process * * *." (Citations omitted.)

**{¶78}** Sufficiency of the evidence is a legal test dealing with the adequacy, as opposed to the weight, of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In viewing a sufficiency of the evidence argument, a conviction will not be reversed unless the reviewing court determines, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could find that the elements of the offense were proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998); *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

**{¶79}** In other words, the evidence is sufficient if, after construing the evidence in the state's favor, reasonable minds can reach different conclusions as to whether each element has been proven beyond a reasonable doubt. *Id. See also State v. Bridgeman*, 55 Ohio St.2d 261, 263, 381 N.E.2d 184 (1978). Appellant focuses his argument here on the intent element by arguing that there was insufficient evidence of his complicity in the principal's intent to shoot at the Cadillac. He states that the mere fact that he was driving the car from which the passenger fired is not enough for complicity. He urges that the only way to find complicity in this case would be to improperly stack inferences.

**{¶80}** It has been stated that an inference which is based entirely upon another inference and which is unsupported by any additional fact or another inference from other facts is a universally condemned inference upon an inference. *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 333, 130 N.E.2d 820 (1955). However, an inference which is based in part upon another inference and in

part upon factual support is a parallel inference and is universally approved if it is a reasonable conclusion for the jury to deduce. *Id.* The jury is permitted to draw several conclusions or presumptions of fact from the same set of facts, and a series of facts or circumstances may be used as the basis for ultimate inferences. *Id.* at 334.

> "While the rule prohibiting the stacking of inferences is still recognized in Ohio, the rule is extremely limited. It merely prohibits the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts. But the rule does not forbid the use of parallel inferences in combination with additional facts. Nor does it prohibit the drawing of multiple inferences separately from the same set of facts. Because reasonable inferences drawn from the evidence are an essential element of deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited."

*State v. Kalman*, 8th Dist. No. 90752, 2009-Ohio-222, ¶ 23, quoting *Sellers v. Whitt*, 2d Dist. No. 91 CA 96 (Nov. 3, 1993).

**{¶81}** To uphold a conviction for complicity by aiding and abetting, the evidence must show that with shared criminal intent, the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime. *State v. Johnson*, 93 Ohio St.3d 240, 245-246, 754 N.E.2d 796 (2001) (actual participation in the act is not required). Although an innocent bystander who is merely along for the ride is not complicit, complicity may be demonstrated by circumstantial as well as direct evidence. *See id.* Merely because there is no proof that a defendant articulated his intent will not invalidate his conviction. *Id.* at 245. Participation in criminal intent can be inferred from circumstances surrounding the offense including presence, companionship, and conduct before and after the offense is committed. *Id.* at 243, 245-246.

**{¶82}** Appellant was with Aubrey Toney at the game where Toney talked about Piru and the latest stalking incident in their ongoing feud. (DVD Tr. 110). Appellant knew the violent details of Aubrey Toney's past feuding with Piru and OB. While at the game, Aubrey Toney received a call alerting him to the presence of Piru near his father's house. (Tr. 171-172, 195-196, 372-373). Appellant claimed to police that he had no feud with these individuals, but his claim need not be believed. Aubrey Toney was a very close and loved friend who was at appellant's house "constantly." Appellant considered his house Aubrey Toney's "safe house" for when someone was after him. Aubrey Toney stored his bullet proof vest at appellant's house, cycled his .308 rifle there, and left a .308 cartridge behind.

**{¶83}** Appellant left the game with Aubrey Toney in a small car that Toney was using. They went to borrow Toney's cousin's large SUV. Appellant then drove the cousin's SUV. During that time, Toney received a call from his other cousin, who was concerned that they borrowed the SUV, during which conversation Toney stated that he could not talk because "I have dibs on somebody now."

**{¶84}** A burgundy 1990 Cadillac DeVille was sitting in front of a church in the neighborhood where appellant was driving around. It was well-known that OB drove a burgundy 1990 Cadillac DeVille. Appellant drove down a dead-end street and turned around. His explanation for switching vehicles was to more comfortably drive around smoking marijuana, drinking, and otherwise "kickin' it." He claimed that the reason he turned down that street was to meet a marijuana dealer that Aubrey Toney set up for him because he could not find weed himself. Yet, from the contents of his house and pockets, it seems that he does not have a problem finding drugs.

**{¶85}** In addition, laughter was heard from the SUV as it drove toward the stop sign at Southern Boulevard. This is about the time that appellant claims he first saw Aubrey Toney wrestling with the big rifle to "bring [it] up," explaining that it was too big for him to just "whip it out." (DVD Tr. 91, 122). This also shows that the gun was in the front passenger area before it was brandished. Appellant claimed in his statement to police that he did not see the large gun in the SUV earlier. Considering

how large a .308 rifle is (in combination with appellant's various adjectives used in describing the gun), his claim need not be believed.

**{¶86}** Appellant points out that it was stipulated that he is legally blind in his right eye, urging that this bolsters his claim that he did not see the weapon. The jury could consider that someone "legally blind" in one eye may not be totally blind and that someone legally blind in one eye, who has been driving around, would have had to turn their head (just more fully) in order to check for traffic.

**{¶87}** Moreover, a witness told police that the SUV beeped its horn prior to the shots and thus just as the Cadillac containing two occupants approached. And, appellant's statement to police pointed out that the video of the incident may show that he "stuttered on the gas" during the shooting, suggesting that he was concerned the video would show he was driving through the intersection slowly so that Aubrey Toney could continue firing at the Cadillac as it continued past. (Tr. 140). In addition, after the shooting, while Toney and appellant still had the SUV, Toney's cousin called him again, and Toney allegedly reported, "I think I got him. I think we got him." (Tr. 375-376, 405, 418).

**{¶88}** Regarding actions after the offense, appellant made a telephone call from the interrogation room advising the recipient to "spread the word" that someone told the police everything and that they should all "squeeze" the "rat." (DVD Tr. 158). He also asked someone to tell Aubrey Toney's sister that the police know everything, that someone in the "click" told, and that they have the shooting on camera. (DVD Tr. 179). He is also heard lamenting how he was too lazy to clean the house after the shooting and that the people he entrusted to dispose of evidence left the shells. (DVD Tr. 78, 158, 181). He also told his relatives, "It wasn't supposed to happen like that. He wasn't supposed to do that." (DVD Tr. 79-80).

**{¶89}** Considering all of the evidence in the light most favorable to the state, some rational fact-finder could believe that appellant was complicit in Aubrey Toney's purpose to shoot at Piru and/or OB and/or the occupied burgundy Cadillac. *See State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 50 (emphasizing that the test is whether "*any* rational trier-of-fact could have found the

essential elements"). All necessary inferences here are reasonable conclusions and are based upon factual support or are based in part upon another inference and in part upon factual support. *See Hurt*, 164 Ohio St. at 333. Various interpretations of appellant's statements are reasonable and do not constitute inference upon inference without factual support.

**{¶90}** When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272–273, 574 N.E.2d 492 (1991). Appellant's participation in the criminal intent can reasonably be inferred from the circumstances surrounding the offense including close companionship and protection, conduct before the offense, presence, the fact and method of driving, knowledge of the feud which involved past shooting incidents, and conduct after the offense. *See Johnson*, 93 Ohio St.3d at 243, 245-246. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

**{¶91}** Appellant's fourth assignment of error alleges:

**{¶92}** "Kevin Agee's convictions are against the manifest weight of the evidence * * *." (Citations omitted.)

**{¶93}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Id.* "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Id.* It is the job of the fact-finder to weigh the evidence and determine whether the greater amount of credible evidence sustains the issue to be established. *Thompkins*, 78 Ohio St.3d at 387.

**{¶94}** In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387, 389. An appellate court's reversal of a jury verdict on weight of the evidence grounds can

only be accomplished by a unanimous three-judge panel. *Id.*; Ohio Const. Art. 4, § 3(B)(3).

**{¶95}** The appellate court's power to grant a new trial on these grounds should only be exercised in the exceptional case where the evidence weighs heavily against the conviction. *Thompkins*, 78 Ohio St.3d at 387. This test acknowledges that credibility is generally the province of the jury who sits in the best position to assess the weight of the evidence and credibility of the witnesses whose gestures, voice inflections, and demeanor are personally observed. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). *See also Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Where there are two fairly reasonable views or explanations, we do not choose which one we prefer. *State v. Black*, 7th Dist. No. 03JE1, 2004-Ohio-1537, ¶ 18. Rather, we defer to the trier of fact unless the evidence weighs so heavily against conviction that we are compelled to intervene. *Id.*

**{¶96}** Appellant states that the evidence discussed in assignment of error number one had a corrosive effect on the jury's evaluation of the weight of the evidence. He urges that the state's evidence was not strong. He notes that the defense expert countered the BCI agent's testimony that the extraction marks on the fired .308 cartridge from the scene of the shooting match those on the unfired .308 cartridge from the bookshelf in appellant's living room.

**{¶97}** Specifically, the BCI agent explained how a person can cycle a live bullet through a weapon without firing it and testified that this could leave extractor marks and/or ejector marks on the bullet. (Tr. 306-307). The BCI agent stated that the ejector marks were in corresponding locations, but there was insufficient microscopic detail to say that they matched. (Tr. 325-326). He did state, however, that the *extractor* marks on the bullet from appellant's house matched the ones on the shell recovered from the murder scene. (Tr. 307). He stated that sometimes an extractor mark had insufficient detail for a conclusion, but here, there were "very good

striated marks that you could individually identify." (Tr. 327). The BCI agent noted that his evaluation was verified by a second examiner as well. (Tr. 310).

{¶98} The defense expert testified that "there was not a matching identification of extractor tool marks, and therefore I cannot conclude that they were cycled through the same weapon." (Tr. 592). He also stated that he "could not reach a determination as to whether each of those cartridges were cycled through the same weapon," which made it sound more like there was insufficient detail, not that they were mismatched.

{¶99} As the state tried to emphasize below, appellant admitted that it was a big rifle and its ammunition had been at his house prior the shooting, that he saw Aubrey Toney using the gun in a way that made metallic "clacking" sounds, that this rifle was used by Aubrey Toney in the shooting, that Aubrey Toney left incriminating ammunition at his house, and that people were supposed to clean such incriminating evidence from his house. These admissions served to diminish any suggestion that the unfired .308 cartridge did not connect appellant's house to the shooting.

{¶100} In any event, this competing testimony of the experts was a matter for the jury. And, even if the defense expert's testimony was convincing on the matter of whether there was sufficient detail present for a conclusion to be made on an exact match, such insufficient detail would not be exculpatory or result in an unreliable verdict.

{¶101} Appellant also states that the credibility of Aubrey Toney's cousin is diminished because he first came forward due to a reward. This witness disclosed that he did not want to sell his cousin out for reward money but that he was in fear for his life. He suggested that he thought he could leave town for his safety if he received the reward money. (Tr. 389). He noted that he was afraid and pointed out that he was alienated from his family because he spoke to police. (Tr. 384). A detective disclosed that this witness asked for reward money and that he received $1,500. (Tr. 542).

{¶102} The witness's concern for his safety and his belief that the money would allow him to find a safe place to reside are not incredible statements. The jury

watched him testify; they saw his demeanor and heard his voice inflections. Where there is a reward and a witness has pertinent information in a shooting, the fact that the witness asks for a portion of that reward money does not make him an incredible witness thereafter, especially where the witness's statement was confirmed by appellant as to the background of the feud, appellant being with Aubrey Toney, the borrowing of the other cousin's car, and the fact that said car was in fact used in the shooting.

{¶103} Appellant also refers here to contradictions in this witness's statement to police and his statement at trial. For instance, this person testified that Aubrey Toney stated, "I think we got him." (Tr. 375). On cross-examination and again on redirect, he stated that Aubrey Toney stated both "I think *I* got him." and "I think *we* got him." (Emphasis added). (Tr. 405, 418). Apparently, this witness's statement to police did not mention Aubrey Toney's reference to "we." (Tr. 421). This discrepancy was delved into at trial. The jury was presented with the issue. How they resolved the issue was within their province as fact-finder. They may have believed the witness's claim that Aubrey Toney used "we" the second time. Or, they may have resolved it in favor of the police statement. But, this still would not exculpate appellant.

{¶104} Upon reviewing the entire record, including a thorough reading of the transcript, we do not believe that the jury's verdict is contrary to the manifest weight of the evidence. There is no indication that the jury clearly lost its way and created a manifest miscarriage of justice by finding appellant complicit in the shooting. Rather, the jury drew acceptable inferences from the evidence presented and properly judged the credibility of the witnesses, evaluated the implications of appellant's statements, and weighed the overall evidence. In accordance, we refuse to sit as the "thirteenth juror" as urged by appellant. Accordingly, this assignment of error is overruled.

{¶105} For the foregoing reasons, the murder conviction for the death of Thomas Repchic is upheld. The attempted murder and the felonious assault offenses committed against Jacqueline Repchic should have been merged at

sentencing as there was no separate animus for each offense. The case is thus remanded for resentencing on either attempted murder or felonious assault as elected by the state.


Donofrio, J., concurs.
Waite, J., concurs.