[Cite as *State v. Agee*, 2016-Ohio-7183.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 14 MA 0094 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| KEVIN D. AGEE, JR. | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 10 CR 1135

JUDGMENT:    Affirmed.

APPEARANCES:

For Plaintiff-Appellee:    Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio  44503

For Defendant-Appellant:    Atty. Timothy Young
Ohio Public Defender
Atty. Kenneth R. Spiert
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio  43215

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  September 30, 2016

WAITE, J.

{¶1} Appellant Kevin D. Agee, Jr. appeals the June 17, 2014 decision of the Mahoning County Court of Common Pleas denying his amended petition for postconviction relief without an evidentiary hearing in this capital case. Appellant was convicted of murder, in violation of R.C. 2903.02(A), (D), a felony of the first degree, with an accompanying firearm specification pursuant to R.C. 2941.145(A); attempted murder, in violation of R.C. 2923.02(A) and 2903.02(A), (D), a felony of the first degree, with an accompanying firearm specification pursuant to R.C. 2941.145(A); felonious assault, in violation of R.C. 2903.11(A)(2), (D), a felony of the second degree, with an accompanying firearm specification pursuant to R.C. 2941.145(A); and felonious assault, in violation of R.C. 2903.11(A)(1), (D), a felony of the second degree, with an accompanying firearm specification pursuant to R.C. 2941.145(A). Appellant's convictions resulted from his participation in the drive-by shooting of an elderly couple on the south side of Youngstown. Appellant was driving. His passenger fired a weapon into the victims' 1990 Cadillac DeVille in the mistaken belief that the automobile belonged to a neighborhood rival. Appellant was sentenced to fifteen years to life in prison for the murder conviction, ten years for attempted murder, plus three years on two merged firearm specifications, for an aggregate sentence of 28 years to life of imprisonment. The felonious assault charges were merged at sentencing. For the reasons that follow, the judgment of the trial court is affirmed.

Facts and Procedural History

**{¶2}** The procedural history and facts of this case were set forth in this Court's previous opinion in *State v. Agee*, 7th Dist. No. 12 MA 100, 2013-Ohio-5382:

Appellant's friend, Aubrey Toney, was involved in an ongoing feud with two individuals nicknamed Piru and OB. It seems that Piru believed Aubrey Toney shot at his house, and Aubrey Toney believed that Piru retaliated by shooting up his car. Aubrey Toney also believed that he was once arrested due to Piru snitching on him. And, Aubrey Toney was upset that OB punched him in the back of the head at a gas station, causing him to suffer migraines. OB was known to drive a burgundy 1990 Cadillac DeVille that was described as "old school" and "flashy." (Tr. 178, 482).

On September 25, 2010, Aubrey Toney was at a little league football game with appellant Kevin Agee when he received a call from his female cousin sometime around the noon hour, stating that Piru was across the street from Toney's father's house on Ferndale Avenue. His male cousin got on the phone as well to ask about the Piru situation. Aubrey Toney and appellant soon arrived at the female cousin's house on Hilton Avenue and borrowed her reddish or burgundy Dodge Durango, leaving the small car Toney had been driving at her house.

When the male cousin learned that Aubrey Toney borrowed the Durango, he was concerned and called Toney who advised that he would have to call him back because he has "dibs on somebody now."

(Tr. 375). Appellant Kevin Agee drove the Durango with Aubrey Toney in the passenger seat. At some point, appellant drove down Southern Boulevard and turned down a short dead-end portion of Philadelphia Avenue. He then turned around and stopped at the stop sign at Philadelphia Avenue and Southern Boulevard.

In the meantime, around 1:00 p.m., Thomas Repchic, age 74, was sitting in his burgundy 1990 Cadillac DeVille outside of St. Dominic's church, on the corner of Southern Boulevard and Lucius Avenue waiting for his wife, who worked as a secretary at the church. Jacqueline Repchic, also 74, got in their Cadillac, and they proceeded north on Southern Boulevard.

As the Cadillac approached the Durango at Philadelphia Avenue, Aubrey Toney wrested a large .308 rifle from next to his seat and fired seven shots into the Repchic vehicle. One shot went through the passenger door and took off Mrs. Repchic's right foot; her other foot was also injured by bullet fragments. (Tr. 56-57). Another shot went through the back of the driver's seat and killed Mr. Repchic by entering his lung and heart. Mrs. Repchic reached over and steered the car into the curb just before the busy y-junction at Market Street.

The City of Youngstown's Shotspotters system triangulated the seven shots it heard as occurring near the Southern Boulevard and

Philadelphia Avenue intersection and transmitted this information to its patrol cars. Officers followed a blood trail leading from the car toward the intersection where they found a fired .308 cartridge in the middle of the street.

The police interviewed witnesses near that area who saw a red Durango go down the street and saw gun smoke near the Durango after the shots were fired. The Durango was also seen on various security cameras at the time of the shooting. A witness said the passenger was a dark-skinned black male with short hair and the driver was a lighter-skinned black male with a bushy ponytail. (Tr. 96). Appellant was a lighter-skinned black male with long dreadlocks, and Toney's female cousin stated that the person with Toney, whom she believed would be driving her car that day, had his hair "locked up." (Tr. 174, 381, 460).

Aubrey Toney returned the Durango to his cousin 20-35 minutes after he borrowed it. (Tr. 175). Later that evening, Aubrey Toney apologized to her for putting her in the middle of his feud and gave her money to stay in a hotel. (Tr. 177, 184, 199). The police canvassed the area and spoke to each person who owned a Durango. Aubrey Toney's cousin initially denied that she loaned out the vehicle, but she soon admitted that she loaned him the vehicle at the time of the shooting and told police what she knew about the feud.

Aubrey Toney's male cousin also spoke to police about the feud and about Aubrey's statements to him on the phone around the time of the shooting, such as that he "had dibs" on someone. And, in the second call, Toney stated, "I think I got him." (Tr. 375, 405, 418). This male cousin also told the police that appellant Kevin Agee was involved and opined that the gun would be found in appellant's garage, describing a house on Garfield Street. (Tr. 381-383).

On September 28, 2010, the police executed a search warrant at the house on Garfield just as appellant was exiting the house. They found an unfired .308 cartridge on the living room bookshelf. A BCI agent testified at trial that this unfired cartridge had been cycled through a gun and had extractor marks that matched the fired cartridge found at the scene of the shooting. The police also seized guns, other ammunition, bullet proof vests, crack cocaine, drug paraphernalia, and a ball cap with a red C on it which matched the description of the hat worn by one of the occupants of the Durango.

When appellant was interviewed by police, he initially stated that he saw Aubrey Toney at the game but left with someone else and that he was not present during the shooting. (DVD Tr. 14-15, 27, 30, 32-33). He stated that Aubrey Toney is one of his closest friends, that he loved him, that Aubrey was constantly at his house, and that they often got high together. (DVD Tr. 19-20, 26, 32, 61). He knew of Aubrey

Toney's feud with Piru and OB, and he knew that OB had a car like the one on the news. (DVD Tr. 9-14). Regarding the unfired .308 cartridge, he stated that Aubrey Toney had a very long gun at his house one night, that he heard Aubrey making metallic "clacking" noises with it, and that Aubrey must have left some .308 ammunition behind. (DVD Tr. 16, 35, 60).

Appellant's grandmother then spoke to him. She stated that security cameras on the streets showed him driving the vehicle and said that the hat described by a witness was found in his house. (DVD Tr. 63, 65). She disclosed that an eyewitness described one person as darker-skinned and the other as lighter-skinned. (DVD Tr. 65). She advised him to say he was driving but that he was in the wrong place at the wrong time, urging that he did not owe the shooter anything. She said she did not believe he knew what the shooter was going to do when he saw that car. (DVD Tr. 64). They then spoke of what it meant to be an accessory. (DVD Tr. 71-72). Appellant's mother entered and told him that Piru was watching her house. (DVD Tr. 77). His mother also told him that Aubrey Toney's female cousin worried that someone they knew was talking to police. (DVD Tr. 81). His relatives then left the room, and the detectives reentered.

At that point, appellant admitted that he had been driving the Durango when Aubrey Toney fired at the Cadillac. Appellant explained that he

left the game with Toney and they switched from the small black Dodge Caliber that Toney was driving to the Durango because it was bigger. (DVD Tr. 88, 97). He denied seeing the big gun in either car. (DVD Tr. 88, 98). Appellant said that he drove the cousin's car because he had a license. He insisted that he did not expect Aubrey Toney to shoot at a car and that his only plan was to drive around while drinking and smoking weed. (DVD Tr. 87-88, 111).

Appellant stated that they were about to stop at a house to buy weed but the man they were meeting was not there yet so he turned around. (DVD Tr. 106). He explained that while he was at the stop sign, Aubrey Toney wrestled with the gun to bring it out of the window and then he started shooting. (DVD Tr. 90-92, 122). Appellant said that he did not have a "beef" with anyone and denied that there was talk of Aubrey Toney's feud in the car before the shooting. (DVD Tr. 108, 133).

When his relatives were permitted in the interrogation room again, appellant made some phone calls. During one call, he talked about someone telling everything to the police and said, "Tell every fucking body, man. We gotta -- you all squeeze that mother fuckin' rat." (Tr. 158). Appellant was then booked into the jail. He and Aubrey Toney were soon indicted for aggravated murder with a death specification for the death of Thomas Repchic. Regarding Jacqueline Repchic, they were indicted for attempted murder, felonious assault (deadly weapon),

and felonious assault (serious physical harm). All four counts carried firearm specifications.

Appellant's case was tried to a jury. The state presented the testimony of the police officers, detectives, and BCI agents involved in the case, two neighbors from the area of the shooting, a 911 dispatcher, a Shotspotters representative, two priests, the medical examiner, and Aubrey Toney's male and female cousins. The jury watched the DVD of appellant's time in the interrogation room, including his two statements to police.

The defense presented expert testimony that disagreed with the BCI agent's testimony regarding matching extractor marks, as he opined that it could not be concluded that the live cartridge and the fired cartridge had been cycled through the same gun. (Tr. 592-593). It was stipulated to the jury that appellant had been legally blind in his right eye since 1994. (Tr. 602).

On April 4, 2012, the jury found appellant guilty of the murder, but not the aggravated murder, of Thomas Repchic. The jury found appellant guilty of all three counts involving Jacqueline Repchic and all four firearm specifications. At sentencing, the state agreed that the two counts of felonious assault committed against Jacqueline Repchic would merge with each other. The state argued that the remaining

felonious assault would not merge with the attempted murder of the same victim because the evidence shows that Jacqueline was shot in the leg and the shooter then continued to fire shots at the vehicle after it drove past so that her life remained in danger after she was shot. (Sent. Tr. 6-7). The defense countered that the remaining felonious assault would merge with the attempted murder as there was no separate animus for each offense against the same victim. (Sent. Tr. 9).

In a May 23, 2012 sentencing entry, the court imposed fifteen years to life for murder plus three years for the attached firearm specification, ten years for attempted murder plus three years for that attached firearm specification, and eight years for one count of felonious assault (merging one felonious assault into the other and merging both firearm specifications attached to the felonious assaults into the other two firearm specifications). The sentences were run consecutive for a total sentence of 39 years to life.

*Id.* ¶ 3-21. On direct appeal, this Court sustained a single assignment of error, and remanded the case to allow the trial court to merge the attempted murder and remaining felonious assault charge committed against Jacqueline Repchic. *Id.* ¶ 105.

{¶3} In this appeal of his amended petition for postconviction relief, Appellant first argues that he was denied both due process of law and his right to counsel when his trial counsel failed to obtain the services of a neuropsychologist and/or

neurologist to evaluate and provide evidence of his traumatic brain injury ("TBI") and residual conditions. Appellant contends that these constitutional deprivations prevented him from challenging the knowing waiver of his right to counsel and right against self-incrimination, and prohibited him from offering testimony regarding his cognitive deficits at trial in order to explain his unwitting participation in the crimes. Appellant further contends that he was denied due process of law when the trial court denied the motion to suppress his confession, due to the state's overreaching in manipulating his mother and grandmother to convince him to admit his involvement in the crimes.

{¶4} Next, Appellant contends that both his rights to counsel and due process of law were violated when his trial counsel failed to recognize or challenge a key piece of physical evidence underpinning his conviction. Appellant argues that his right to due process was violated by the trial court's decision to place a witness in handcuffs during her testimony, and to allow the state to display to the jury numerous firearms found at the residence of Appellant's mother, including a .308 rifle, despite the fact that the rifle actually used in the drive-by shooting was never found.

{¶5} Appellant also challenges the trial court's dismissal of his amended petition because the trial court allegedly relied on incorrect facts, and the court failed to address his fourth ground for relief in its entirety. Finally, Appellant argues that the cumulative effect of the foregoing errors and omissions demonstrate sufficient prejudice to warrant a hearing before the trial court.

**{¶6}** At oral argument, Appellant withdrew his seventh assignment of error, which was based on the trial court's denial of his postconviction motion for appropriation of funds for a defense neurological expert to testify and refusal to stay proceedings on the postconviction petition pending the results of this neurological testing.

**{¶7}** Attached to the amended petition are: the affidavit of Kort Gatterdam, a criminal defense attorney licensed in Ohio; the affidavit of Valerie Kunze, Assistant Public Defender and co-counsel in this appeal; the affidavit of Appellant; the affidavits of Rhys Cartwright-Jones and James Gentile, Appellant's trial counsel; and the affidavit of Barbara Nocho, Appellant's grandmother. In addition, several photographs are attached to the Gatterdam, Kunze, and Cartwright-Jones affidavits. Medical records from 2004-2005 relating to injuries Appellant suffered in a 2004 automobile accident are attached to the amended petition, as well as a decision of the Social Security Administration awarding Appellant supplemental social security in 2007.

<u>Law</u>

**{¶8}** Pursuant to R.C. 2953.21(A)(1)(a), a person convicted of a criminal offense who asserts a violation of his or her constitutional rights may petition the court that imposed sentence for appropriate relief. A postconviction petition is not an appeal of the underlying matter; instead, it is a civil action that collaterally attacks a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994).

State postconviction review is not a constitutionally protected right, even in capital cases. Thus, the petitioner receives only those rights established by statute. *Id.*

{¶9} To prevail on a claim for postconviction relief, the petitioner must demonstrate a denial or infringement of his rights in the proceedings resulting in his conviction sufficient to render the conviction void or voidable under the Ohio or United States Constitutions. R.C. 2953.21(A)(1). A postconviction petitioner bears the initial burden of demonstrating in the petition, any supporting affidavits, and in the trial record that there are "substantive grounds for relief." R.C. 2953.21(C), *State v. Jackson*, 64 Ohio St.2d 107, 111, 413 N.E.2d 819 (1980). A postconviction claim is subject to dismissal without a hearing if the petitioner fails to support the claim with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. R.C. 2953.21(C) and (E). Hence, a criminal defendant challenging his conviction via a petition for postconviction relief is not automatically entitled to a hearing. *Id.*, see, also, *State v. Cole*, 2 Ohio St.3d 112, 113, 443 N.E.2d 169 (1982).

{¶10} The purpose of the postconviction relief statute is to provide criminal defendants with a clearly defined method by which they may raise claims of denial of federal rights. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999), citing *Young v. Ragen*, 337 U.S. 235, 239, 69 S.Ct. 1073, 1074, 93 L.Ed. 1333 (1949). However, a postconviction petition is not a forum to relitigate issues that could have been raised on direct appeal. See *Steffen* at 410; *Cole, supra*, at 113. Accordingly, many claims are barred by *res judicata*.

Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising or resurrecting issues in collateral review that could have been raised and fully litigated on direct appeal. *State v. Reynolds* (1997)*, 79 Ohio St.3d 158, 161, 679 N.E.2d 1131; *State v. Perry* (1967), 10 Ohio St.2d 175, O.O.2d 189, 226 N.E.2d 104, paragraph nine of the syllabus. Where, however, an alleged constitutional error is supported by evidence that is de hors the record, res judicata will not bar the claim because it would have been impossible to fully litigate the claim on direct appeal. *State v. Smith* (1985), 125 Ohio App.3d 342, 348, 708 N.E.2d 739.

*State v. Green*, 7th Dist. No. 02 CA 35, 2003-Ohio-5142, at ¶ 21.

{¶11} "Evidence outside the record by itself, however, will not guarantee a right to an evidentiary hearing. To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record." *State v. Combs*, 100 Ohio App.3d 90, 97, 652 N.E.2d 205 (1st Dist.1994), citing *Cole*, syllabus.

{¶12} Further, evidence *dehors* the record must meet a minimum level of cogency in support of the claim so as to require a hearing. *Combs* at 98, citing *Cole* at 115. Accordingly, although in "reviewing a petition for postconviction relief * * *, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, [it] may, in the sound exercise of discretion, judge the credibility of the affidavits in determining whether to accept the affidavits as true

statements of fact." *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999), syllabus. Thus, "[t]he trial court may, under appropriate circumstances in postconviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant. That conclusion is supported by common sense, the interests of eliminating delay and unnecessary expense, and furthering the expeditious administration of justice." *Id.* at 284.

Analysis

**{¶13}** Appellant's first and fourth assignments of error are based on trial counsel's failure to request the appointment of a neurological expert to testify at the hearing on the motion to suppress Appellant's confession and during the guilt phase of the trial. They also involve the trial court's denial of the motion to suppress, despite Appellant's cognitive impairment and the state's overreaching by manipulating Appellant's mother and grandmother into encouraging his confession. For the purpose of judicial economy and clarity of analysis, the first and fourth assignments of error will be addressed together.

*Appellant's cognitive impairments*

**{¶14}** Appellant contends that a neuropsychologist and/or neurologist should have been appointed to offer testimony regarding his TBI and dementia, allegedly sustained as a result an automobile accident that occurred roughly six years prior to the criminal offense at issue in this case. Following the accident, Appellant underwent brain surgery. At the hearing on the motion to suppress Appellant's confession, trial counsel relied on the opinion of Appellant's defense mitigation

expert, Sandra McPherson, Ph.D., a psychologist, to evaluate and present evidence as to the effect of Appellant's TBI and dementia on his ability to understand his *Miranda* warning and waive his right to self-incrimination.

{¶15} At the suppression hearing held on August 23, 2011, Dr. McPherson provided the following testimony regarding the injuries suffered by Appellant in the 2004 automobile accident:

> He suffered fairly severe and diffuse brain injury involving a number of areas of function. He was treated for that and he was subsequently evaluated over a period of about a year or so for his degree of functional capacity. And those records also documented his 100 percent blindness in the right eye which was an injury occurring prior to the auto accident at his age of 9. The records indicated that his cognitive capacities were affected in various ways, including what the examining doctors referred to as dementia or the ability to think coherently and rationally, the ability to do those things that are necessary to obtain a general equivalence degree which is a way a person that has not completed high school can complete a high school rating. He was judged to be incapable of taking that course and achieving that status.
>
> He seemed to have memory deficit but also what is known as memory and sensory issues. He had symptoms that reflected the action of his nervous system creating discomforts of various kinds, not because

there was a tissue injury but because the nerves are providing symptomatic outputs to him. It is part of the brain damage. He had problems with gate, which over time did show some improvement.

(Suppression Hrg. Tr., pp. 57-58.)

{¶16} Dr. McPherson testified that she performed cognitive testing, including the Wechsler Adult Intelligence Scale, fourth revision, which she opined was "a standard state of the art instrument for mapping cognitive function for [a] variety of purposes, but it is standardly used as part of assessing cognition in cases of brain damage." *Id.* at 60. She also performed the Bender Gestalt Test of Visual Motor Ability and a Grisso Understanding and Appreciation of Miranda Rights Examination. *Id.*

{¶17} According to Dr. McPherson's testimony, Appellant was "not a quick responder," during her examination and needed some words in the Miranda waiver to be defined, for instance, the word "entitle." *Id.* at 62. She further testified that Appellant frequently sought reassurance that he was answering her questions correctly. *Id.* at 62-63.

{¶18} Despite McPherson's concession on cross-examination that Appellant clearly understood his right to remain silent, *Id.* at 63, she concluded that Appellant did not understand the *Miranda* warning provided by the detectives who questioned him. Referring to the videotaped confession, Dr. McPherson explained that it took Appellant "many seconds" to respond to questions regarding his understanding of each separate part of the *Miranda* warnings. She testified, "I suppose it is possible

that he immediately understood the statement and just didn't say anything for a long period of time but I don't think so." *Id.* at 65.

**{¶19}** Next, Dr. McPherson observed that, although Appellant's variability in response time would be superior to a congenitally disabled individual, he was still likely to be a yay-sayer, that is, a person who says he understands statements even when he does not. *Id.* at 69-70. She further testified that Appellant's ability to understand the Miranda warnings would likely have been even more compromised due to stress and his use of marijuana, alcohol and cough syrup in the days before he was questioned. *Id.* at 73-74. Dr. McPherson concluded that "at the time that the Miranda rights were done, based on the [videotape of the confession] that [she] saw, he was not given any of the information and time to manage the information that would have been necessary for him to come to that understanding." *Id.* at 78-79.

**{¶20}** On cross-examination, Dr. McPherson acknowledged that Appellant has previously been found competent to stand trial and conceded that her inquiry into Appellant's ability to understand the legal process was "within the same [analytical] ballpark." *Id.* at 81. Dr. McPherson further acknowledged that the car accident at issue resulted in a criminal charge for cocaine possession, to which Appellant ultimately pleaded guilty. Due to this conviction and the fact that Appellant repeatedly violated his probation stemming from that conviction, Dr. McPherson conceded that Appellant had considerable exposure to the legal process following his brain injury. *Id.* at 84-85. Likewise, Dr. McPherson conceded that Appellant was

sufficiently aware of his circumstances to deny any involvement in the crime during the first forty minutes of the videotaped confession. *Id.* at 90-91.

<u>First Assignment of Error</u>

The trial court violated Kevin Agee's rights to counsel and due process by summarily denying his claim that trial counsel were ineffective in failing to obtain the services of a neuropsychologist and/or neurologist to evaluate Kevin and present evidence regarding his traumatic brain injury and the dementia it caused. This violated Kevin Agee's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

**{¶21}** According to the U.S. Supreme Court, "the Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a fair trial.' " *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993), quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984), and citing *Nix v. Whiteside*, 475 U.S. 157 (1986); *United States v. Cronic*, 466 U.S. 648, 653 (1984), and *United States v. Morrison*, 449 U.S. 361 (1981). And "[a]bsent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *Lockhart*, 506 U.S. at 369, quoting *Cronic*, 466 U.S. at 658.

**{¶22}** To prove a claim of ineffective assistance of counsel under *Strickland*, the defendant must show that: (1) counsel's performance was deficient (falling below an objective standard of reasonableness), and (2) the deficient performance prejudiced the defense. See *Strickland*, 466 U.S. at 388; *State v. Madrigal*, 87 Ohio

St.3d 378, 388-389 (2000); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.

**{¶23}** A reviewing court must first determine whether trial counsel's assistance was actually ineffective, in other words, whether counsel's performance fell below an objective standard of reasonable advocacy or fell short of counsel's basic duties to the client. See *Bradley* at 141. To prove deficient performance, the defendant must show that counsel made errors which were so serious that counsel was not acting in a manner guaranteed by the Sixth Amendment. *Id.* at 141-142.

**{¶24}** "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *accord Bradley*, 42 Ohio St.3d at 142; *State v. Thompson*, 33 Ohio St.3d 1, 10 (1987); *State v. Smith*, 17 Ohio St.3d 98, 100 (1985); *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 301 (1965) (stating, "certainly there is a reasonable inference that one licensed by the state to practice law and appointed by a court to represent an accused did competently and properly represent such accused during his trial.")

**{¶25}** In *State v. Mason*, the Supreme Court of Ohio set forth a two-prong test to determine whether an indigent defendant was entitled to funding for expert assistance:

Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial.

*State v. Mason*, 82 Ohio St.3d 144, syllabus (1998).

{¶26} Appellant cites *Powell v. Collins*, 332 F.3d 376 (6th Cir.2003) in support of his argument that trial counsels' failure to request the appointment of a neuropsychologist and/or neurologist constituted ineffective assistance of counsel. In *Powell*, the Sixth Circuit held that an Ohio trial court's failure to appoint a neurological expert for a petitioner with organic brain damage violated due process. The state trial court in that case appointed a clinical psychologist to assess Powell's competency to stand trial, and also to provide testimony on behalf of the defense during the guilt and mitigation phases of the trial. Although the *Powell* Court found harmless error with respect to the guilt phase of the trial (Powell had confessed his intention to rape and kill the victim to a witness), the Court concluded that the psychologist's testimony at the mitigation phase fell short of the constitutional requirements.

{¶27} However, the Sixth Circuit's decision in *Powell* was based on the psychologist's admission that she "was not equipped to conduct the appropriate

examination required for her to set forth all of the facts or information the jury should have considered at mitigation." *Id.* at 395. The *Powell* Court wrote:

> Dr. Schmidtgoessling began by acknowledging that "mitigation is a much broader question than addressed to date ... and if the Court wants a full understanding, I feel it is important to use the techniques to answer those questions." (J.A. at 1026.) She then went on to explain that neither she nor any other staff member at the court's psychiatric clinic were qualified to conduct the type of testing and evaluation that was required to diagnose Petitioner with organic brain damage for the purpose of showing the effect of that factor at mitigation. Dr. Schmidtgoessling indicated that such testing would require a referral to a comprehensive medical facility and specialists in the appropriate fields-precisely the type of assistance Petitioner sought but was denied.
>
> Accordingly, under these facts, unlike with the guilt phase of Petitioner's trial, the testimony of an independent psychiatrist—particularly one who was qualified to conduct the appropriate testing of which Dr. Schmidtgoessling spoke—may have provided facts and information for the jury to consider at mitigation, which may have led to a different recommendation by the jury at sentencing. We therefore believe that the lack of the expert assistance which Petitioner sought, and which he was entitled under *Ake* [*v. Oklahoma*, 470 U.S. 68 (1985)], "had a substantial and injurious effect or influence in determining the jury's"

decision at sentencing, see *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710, such that we are left in "grave doubt" as to the harmlessness of this error, thereby requiring that relief be granted to Petitioner on this issue. See *O'Neal*, 513 U.S. at 437, 115 S.Ct. 992.

*Id.* at 395-396.  No similar admission was made in the present case, and, therefore, *Powell* is not helpful in our analysis.

**{¶28}**  In order to overcome the *res judicata* bar to his ineffective assistance of counsel claim, Appellant offered the affidavit of Kort Gatterdam, a criminal defense attorney licensed in Ohio.  Gatterdam opines that trial counsel was deficient due to their failure to obtain the services of a neuropsychologist and/or neurologist to evaluate Appellant's TBI and dementia, and the combined effect of these on his ability to knowingly waive his rights to counsel and against self-incrimination.  According to Gatterdam, a criminal defense lawyer and former public defender, Appellant's medical records establish cognitive impairments that required the expert testimony of a neuropsychologist or neurologist.  Gatterdam Aff., ¶ 7-8.  Gatterdam explained that a neurologist could have performed an MRI and used other techniques to "see what was actually going on in [Appellant's] brain at or near the time of his arrest."  Gatterdam Aff., ¶ 8.

**{¶29}**  The trial court concluded that the Gatterdam affidavit offered no new evidence regarding the need for a neurological expert.  Gatterdam's affidavit merely offered his opinion on the ultimate question:  whether trial counsel's performance was deficient and whether Appellant was prejudiced.  The trial court stated that the

argument Appellant did not understand his *Miranda* warning was absurd, based on a colloquy between Appellant and the trial court on August 25, 2011, two days after the suppression hearing, where Appellant quoted Albert Einstein. Appellant provided the following testimony at the August 25, 2011 pre-trial conference:

> When I first went to jail, I really didn't know the situation I was in and how deep. * * * I was blessed enough to have a family member [Agee's uncle] actually in the pod when I got there. He already knows my situation, everything, my brain situation.
>
> The first couple weeks I was in there, I was very frustrated, and he had * * * me read a quote, and he had me write it down and put it in my cell, and I read it every day. It's by Albert Einstein. * * * ["A] problem can never be solved at the same level of intelligence in which it was created.["] When I finally figured out what my uncle was trying to tell me, he started having me try to understand the constitution[.]

(8/25/11 Tr., pp. 5-6.)

{¶30} In fact, Ohio appellate districts have consistently concluded that an affidavit by a legal expert does not constitute cogent evidence *dehors* the record sufficient to overcome procedural default. *State v. Group*, 7th Dist. No. 10 MA 21, 2011-Ohio-6422, ¶ 86-87; *State v. Hill*, 1st Dist. No. C961052 (Nov. 21, 1997) ("Attorney's affidavits explaining prevailing norms do not constitute evidence *dehors* the record and are akin to a notarized legal argument."); *State v. Davis*, 5th Dist. No. 2008-CA-16, 2008-Ohio-6841, at ¶ 161-162 (quoting *Hill* and advocating that instead

of a countervailing attorney opinion, a more objective test for attorney ineffectiveness is that set forth in *Strickland*); *State v. Franklin*, 2d Dist. No. 19041, 2002-Ohio-2370, at ¶ 12 ("the affidavit of an attorney giving an opinion based on facts in the record does not constitute evidence outside the record, but merely legal argument[.]") *Accord State v. Jones*, 11th Dist. No. 2000-A-0083, 2002-Ohio-2074; *State v. Scudder*, 131 Ohio App.3d 470, 722 N.E.2d 1054 (10th Dist.1998); *State v. Lawson*, 103 Ohio App.3d 307, 659 N.E.2d 362 (12th Dist.1995). Accordingly, the trial court correctly concluded that Appellant failed to overcome the procedural bar.

{¶31} Even assuming that the Gatterdam affidavit constituted valid evidence *dehors* the record, Appellant failed to offer sufficient operative facts to show that trial counsels' failure to request the appointment of a neuropsychologist and/or neurologist resulted in an unfair trial. There is no evidence in the record before us to show that Appellant's cognitive impairments affected his ability to understand the *Miranda* waiver. On the contrary, the record establishes that Appellant was aware of both the effect and the consequences of his confession.

{¶32} After waving his right to counsel and his right against self-incrimination, Appellant had the presence of mind to deny any involvement in the crime. (DVD Tr., p. 13.) When asked why .308 ammunition and a baseball cap identified by eyewitnesses at the crime scene as being worn by one of the assailants was found at his mother's house, Appellant explained that he and Toney were close friends, and that he let Toney "chill" at the Garfield address. (DVD Tr., pp. 15-16, 21.) He further explained that Toney often left guns and ammunition at the Garfield address because

he considered it a safe place. (DVD Tr., pp. 56, 60-61.) When asked about eyewitness testimony placing him in the vehicle at the crime scene, Appellant stated that he frequently drove around town with Toney, and the eyewitnesses were probably mistaken as to the day they saw them together. (DVD Tr., pp. 18, 32.)

{¶33} Appellant told police that, when he learned about the crime on the local news, he was disappointed that he did not have any information regarding the crime, because there was a reward offered. (DVD Tr., p. 31.) He did not realize Toney was the shooter until the following day, when friends told him that OB drove a Cadillac that was the same color and model as the vehicle targeted in the drive-by shooting. (DVD Tr., p. 33.) When Detective Sergeant Daryl Martin told Appellant that the Durango was being swept for DNA and prints and asked how Appellant would explain the existence of his fingerprints on the steering wheel, Appellant responded that he drove the Durango a few weeks earlier. (DVD Tr., p. 58.)

{¶34} Appellant's grandmother spoke to him outside of the presence of the detectives. She informed Appellant that he had been caught on camera, and that he should tell the truth. (DVD Tr., p. 63.) She also informed him that eyewitnesses placed him at the scene of the crime. (DVD Tr., p. 66.) Appellant told his grandmother that he would be looking at "football numbers * * * [b]ig numbers" for jail time. (DVD Tr., p. 67.) When his grandmother pressed him to confess, Appellant told her that he was not being stubborn, he was "thinking." (DVD Tr., p. 70.) He observed that he was going to get the same number of years whether he was the driver or the shooter. *Id.*

**{¶35}** When Appellant spoke to his mother, he told her that he would receive a high bond and suggested that his girlfriend, whose mother had just died, might have enough money from her mother's estate to provide his bail. (DVD Tr., p. 78.) Agee also told his mother that someone "in the click" was talking, because the detectives had information that eyewitnesses could not have provided. (DVD Tr., p. 83.)

**{¶36}** All of the foregoing evidence reveals that Appellant was processing information quite clearly during the police interrogation. He not only provided succinct excuses for the presence of evidence implicating him in the crime, but also recognized the degree of punishment he would face if convicted, as well as the high bond that would likely be assigned. Of equal import, Appellant had entered a guilty plea to charges of drug possession after his automobile accident, so he was also familiar with the state justice system.

**{¶37}** Appellant has failed to offer evidence *dehors* the record in support of his right to counsel and due process claims regarding the appointment of a neuropsychologist and/or neurologist, which could have been raised on direct appeal. In the alternative, Appellant has failed to offer evidentiary material setting forth sufficient operative facts to demonstrate a reasonable probability that a neurological expert would have aided his defense, and that the denial of expert assistance resulted in an unfair trial. Accordingly, Appellant's first assignment of error based on claims of ineffective assistance of counsel is overruled.

<u>Fourth Assignment of Error</u>

The trial court abused its discretion and violated Kevin Agee's rights under the Fifth and Fourteenth Amendments to the United States Constitution, and Section 16, Article I of the Ohio Constitution by failing to grant relief on the fourth ground for relief, i.e., that he was denied a fair trial when the court overruled the motion to suppress his statement and admitted the statement at trial.

{¶38} In his fourth assignment of error, Appellant asserts that his confession was not freely and voluntarily obtained, both because the expert testimony offered regarding his cognitive difficulties fell short of the constitutional mandate and due to the state overreaching involving his mother and grandmother in the police interview.

{¶39} Appellant's fourth assignment of error corresponds to his fourth ground for relief in the amended petition. Appellant's original petition set forth only three grounds for relief. The trial court did not address Appellant's fourth ground in the June 17, 2014 judgment entry. It appears that the trial court reviewed the original petition, rather than the amended petition. The June 17th judgment entry reads, in pertinent part, "Petitioner asserts three grounds for relief in his brief." (6/17/14 J.E., p. 1.) It is important to note that the state did not respond to the original petition before the amended petition was filed. Accordingly, the trial court must have reviewed the state's motion for judgment on the pleadings, as it was the only responsive pleading filed by the state and it contained argument addressing the fourth ground for relief.

**{¶40}** In order to overcome the *res judicata* bar, Appellant offers the affidavit of Barbara Nocho, his grandmother, who was present with his mother at the police station during his interrogation. The affidavit, reads, in pertinent part:

7. On at least one occasion, Detective Martin left the interrogation room and was pacing up and down the hallway in front of me and [Appellant's mother] saying, "if only [Appellant] would admit to being the driver it would help him with the prosecutor." He said that they would go easier on him, since they had a video showing [Appellant] in a cap and had an eyewitness.

8. Detective Martin asked me a number of times to get [Appellant] to admit being the driver. He then let me go into the interrogation room with [Appellant]. I regret to this day that I did not tell [Appellant] to get an attorney. Because I believed what Detective Martin had told me, I encouraged [Appellant] to talk to the police. I told [Appellant] to tell them that he was the driver, not only because it was the truth, but also because Detective Martin told [Appellant's mother] and me that it would help with the prosecutor and they would go easier on [Appellant] if he did talk.

(Nocho Aff., ¶ 7-8.)

**{¶41}** The Nocho affidavit directly contradicts the testimony offered by Detective Martin at the suppression hearing:

Q Then did you talk to the grandmother outside of the interview room?

A Yes.

Q Did you urge her to go in there and give him some advice?

A No.

Q No?

A No.

Q The information that she gave [Appellant], that they had picked his name out of a lineup -- that they picked your picture out of a lineup, that you told people that you were involved, and that they have you on camera, did you tell her those things?

A I never said anything about a lineup and I never said they picked him out on camera.

Q What did you tell her?

A I told her there was video surveillance in the area and we had information that he was the driver, and it was seen fleeing the area.

Q The video surveillance that is in the area does show the Durango leaving the area; correct?

A Correct.

Q It does not -- you are unable to see who is in the car at that point?

A  Correct.

Q  So you think you were factually accurate when you told her that?

A  Told her what?

Q  That there is a video showing [Appellant] in the car?

A  I didn't say that.

Q  What did you say?

A  I said that there was video of the vehicle fleeing the scene and that we had people telling us he was the driver of the vehicle.

Q  Okay.  That's apparently not what she told him; correct?

A  Correct.

(Suppression Hrg. Tr., pp. 47-48.)  Nocho did not testify at the suppression hearing.

{¶42} It is well established that "[a] suspect's waiver of his right not to incriminate himself, and his subsequent confession, must be made voluntarily, knowingly, and intelligently."  *State v. Shakoor*, 7th Dist. No. 01 CA 121, 2003-Ohio-5140, ¶ 18, citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶43} "In determining whether a pretrial statement is involuntary, a court 'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of

interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 13, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, overruled on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

**{¶44}** In *Shakoor*, this Court recognized that an "officer's suggestion of leniency is not enough to invalidate a confession, but is merely one factor which bears on whether the confession was voluntary." *Id.* at ¶ 23, citing *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895 (1989). Accordingly, "[w]hen a police officer promises that a defendant's cooperation will be considered in resolving the case, or that a confession will be helpful in reducing the charges, a resulting confession is not automatically invalidated." *Shakoor* at ¶ 23, citing *State v. Loza*, 71 Ohio St.3d 61, 641 N.E.2d 1082 (1994), *certiorari* denied, 514 U.S. 1120, 115 S.Ct. 1983, 131 L.Ed.2d 871 (1995). For example, the Supreme Court of Ohio found that a confession was voluntary where the police offered the defendant "help" if he confessed. See *Shakoor* at ¶ 23, citing *State v. Chase*, 55 Ohio St.2d 237, 378 N.E.2d 1064 (1978).

**{¶45}** Appellant provides no explanation for the failure to call Nocho as a witness at the suppression hearing. Further, the Nocho affidavit is directly at odds with Detective Martin's testimony at that hearing. Even if the trial court gave credit to Nocho's statements, it is permissible for the police to suggest that "help" will be

provided to a suspect if he confesses his involvement in a crime, and this does not affect the knowing and voluntary nature of the confession.

{¶46} The second prong of Appellant's suppression argument fails as well. As addressed in the analysis of the first assignment of error, Appellant has failed to demonstrate that the failure to appoint neuropsychologist and/or neurologist resulted in an unfair trial.

{¶47} Finally, the trial court's failure to review the entire transcript of proceedings or address each ground for relief before denying a postconviction petition does not necessarily constitute reversible error. See *State v. Davis*, 133 Ohio App.3d 511, 518 (8th Dist.1999), citing *State v. Broom*, 8th Dist. No. 72581, 1998 WL 230425 (May 7, 1998). For instance, in *State v. McNeill*, the Ninth District specifically concluded that a review of record is not required every time a postconviction petition is filed, writing: "[A] review of record, however, is not necessitated by the mere filing of a petition for post-conviction relief. If the petition is baseless on its face, the trial court need not review the record to establish that dismissal is warranted." *State v. McNeill*, 137 Ohio App.3d 34, 40 (9th Dist.2000), citing *State v. Braxton*, 6th Dist. No. L-98-1032, 1998 WL 351877, at *1 (June 19, 1998). We have likewise concluded that "if the petition is baseless on its face, the trial court may dismiss it without reviewing the record, and without waiting for a response from either the petitioner or the state." *State v. Tribble*, 7th Dist. No. 08 MA 145, 2009 Ohio 2651, ¶ 15, citing *McNeill*.

{¶48} Appellant has failed to offer evidentiary material setting forth sufficient operative facts to demonstrate that his confession was neither knowing nor voluntary. Appellant's fourth assignment of error regarding the trial court's denial of his motion to suppress is overruled.

Second Assignment of Error

The trial court violated Kevin Agee's rights to counsel and due process by summarily denying his claim that counsel were ineffective in failing: 1) to recognize before trial that the bullet depicted in State's Exhibit 103 is not the bullet identified and admitted as State's Exhibit 113 and to present the defense accordingly; and 2) to recognize this discrepancy during trial, bring it to the court's and the jury's attention when Kevin Agee discovered it, and take other appropriate action. This violated Kevin Agee's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶49} At trial, the state offered two pieces of evidence: an unfired .308 cartridge (Exhibit 113), which the state's expert testified had been cycled through a rifle and bore extraction marks that matched extraction marks on a fired cartridge found at the crime scene; and a photo of the unfired .308 cartridge that the state attested was found on a bookshelf at the residence of Appellant's mother on Garfield Street. (Exhibit 103).

**{¶50}** On direct appeal, this Court referred to the house on Garfield Street as Appellant's residence. In fact, it was his mother's residence. Appellant stated during his police interview that he did not live at the Garfield address but did spend a lot of time there. At the time, Appellant was living with his grandmother, who was recuperating from surgery. (DVD Tr., p. 4.)

**{¶51}** In his second assignment of error, Appellant contends that the unfired cartridge depicted in Exhibit 103 is not Exhibit 113. In other words, the actual cartridge, upon which ballistic tests were conducted by both parties, was not the same cartridge that was found at his mother's residence. In order to avoid the procedural bar, Appellant offers his own affidavit and the affidavits of attorneys Cartwright-Jones and Gentile to establish that he discovered the alleged discrepancy during the trial testimony of the defense's ballistics expert.

**{¶52}** Despite Appellant's purported discovery, trial counsel did not raise the issue at trial. Instead, Cartwright-Jones used his camera phone to photograph Exhibit 113 (the .308 bullet) lying on top of Exhibit 103 (the purported photograph of Exhibit 113 found at the residence of Appellant's mother). This is attached as Exhibit D-A to the Cartwright-Jones affidavit. Cartwright-Jones attached the photograph taken at trial in support of Appellant's motion for new trial, which was filed on June 4, 2012, the same day as Appellant's direct appeal. (Cartwright-Jones Aff., ¶ 5.) The motion for new trial and the response brief cannot be located by the Clerk of Courts. In this assignment of error, Appellant also relies on additional photographs of rounds taken by Assistant Public Defender Valerie Kunze, which include a photograph of the

bottom of the Exhibit 113, which reads, "R R 308 WIN", see Exhibit B-5 to Kunze affidavit, and a photograph of the bottom of a 7.62 cartridge, which reads "WA 80 7.62 R1M1," see Exhibit B-4 to Kunze affidavit.

{¶53} Although Appellant contends that he discovered the alleged discrepancy during trial, it is apparent that inquiries were made by Appellant to Detective Martin regarding Exhibit 113 at the August, 2011 suppression hearing:

Q   All right.   Now, this .308 round that you say was found in this residence -- correct?

A  Correct.

Q  Does it say .308 round on it?

A  Yes.

Q  Winchester .308?

A  I don't recall if it was a Winchester but I know it said .308.

Q  Have you looked at that round recently?

A  Not recently, no.

Q  Does it say Winchester 7.62?

A  I don't recall.

Q  But you think it is a .308?

A  Right.

(Suppression Hrg. Tr., pp. 44-45.)

{¶54} Appellant relies on the Gatterdam affidavit to establish that trial counsel's failure to seek exclusion of Exhibit 113, move for a mistrial, or submit the matter to the defense expert who could testify about the alleged discrepancy constituted ineffective assistance of counsel.  (Gatterdam Aff., ¶ 18.)  Gatterdam opines that Exhibits 103 and 113 were the sole means to connect Appellant to the weapon used at the crime scene.  Had Exhibit 113 been excluded, the weapons and ammunition from Appellant's mother's residence would likely have been excluded from evidence.

{¶55} Although the motion for new trial was filed on the same day as the notice of direct appeal, June 4, 2012, Appellant could have raised his ineffective assistance of counsel claim on direct appeal.  App.R. 4(A) requires that the notice of appeal must be filed within thirty days of the final entry.  However, in a criminal case where a timely motion for new trial is filed pursuant to Crim. R.33 for a reason other than newly discovered evidence, the time for filing a notice of appeal from the judgment or final order in question begins to run as to all parties when the trial court enters an order resolving the motion for new trial.

{¶56} In the alternative, Appellant could have amended his notice of appeal to include the trial court's July 17, 2012 denial of the motion for new trial pursuant to App.R. 3(F).  A party may amend a notice of appeal without leave if the time to appeal from the order that was the subject of the initial notice of appeal has not yet

lapsed under App.R. 4. Thereafter, the court of appeals, within its discretion and upon such terms as are just, may allow the amendment of a notice of appeal, so long as the amendment does not seek an appeal from a trial court order beyond the time requirements of App.R. 4.

{¶57} According to his affidavit, Cartwright-Jones' photograph of Exhibits 103 and 113 was attached to the motion for new trial. Therefore, it would have been part of the record on direct appeal, and the issue could have been raised on direct appeal. Hence, *res judicata* bars the second ground for relief.

{¶58} Even assuming that the affidavits and photographs can amount to new evidence, the two trial exhibits and the various additional photographs do not constitute evidentiary material setting forth sufficient operative facts to demonstrate that Exhibit 103 is not a photograph of Exhibit 113. Appellant contends that the round in the photograph appears shiny with a copper head, whereas Exhibit 113 appears dull and scratched. However, the alleged distinctions in coloration appear to be the result of the photographic process. In fact, there is no evidence to suggest that Exhibit 103 does not depict Exhibit 113. Moreover, although it was suggested at the hearing on the motion to suppress that the bullet found at Appellant's mother's house was a 7.62 round, and there is a photograph of 7.62 round attached to the Kunze affidavit, there is no evidence in the record or in the affidavits, explaining the existence of this round at the home of Appellant's mother.

{¶59} As Appellant could have raised his constitutional challenge to trial counsels' failure to raise the evidentiary issue on direct appeal, his second ground for

relief is barred by *res judicata*. Assuming that Appellant has provided new evidence overcoming the procedural bar, Appellant has failed to set forth sufficient operative facts to demonstrate that the round depicted in Exhibit 103 is not the round marked Exhibit 113. Accordingly, Appellant's second assignment of error is without merit and is overruled.

Third Assignment of Error:

The trial court violated Kevin Agee's right to due process by summarily denying his claim that he was deprived of a fundamentally fair trial by the combined effect of: 1) the court's ordering witness Clinkscale to be placed in handcuffs and to testify while having two deputy sheriffs standing beside her; 2) the court's allowing the State to parade before the jury numerous guns found in Kevin's house, and to stack them on counsel's table in plain view of the jury, even though they were not relevant to the charged offenses; and 3) the court's allowing the State to use as demonstrative evidence a .308 rifle during closing argument. This violated Kevin Agee's rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

{¶60} Agee challenged the introduction of the guns at trial on direct appeal. Agee's challenge rested on the Ohio Rules of Evidence; he raised no constitutional challenge on direct appeal. This Court provided the following analysis:

Appellant sets forth four assignments of error, the first of which provides:

"The trial court erred when it admitted irrelevant and prejudicial evidence and thus denied Kevin Agee his rights to due process and a fair trial." (Citations omitted.)

Under this assignment of error, appellant contests the admission of a .308 rifle used as demonstrative evidence. He also contests the admission of guns, ammunition, and drugs found in the search of his residence, stating that the only relevant evidence introduced from the search was the unfired .308 cartridge. He urges that the admission of this evidence was irrelevant in violation of Evid.R. 401 and 402, any probative value was substantially outweighed by the danger of prejudice and confusion of the issues in violation of Evid.R. 403, and improper other acts evidence was used to suggest he was a dangerous criminal in violation of Evid.R. 404(B).

Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401. Relevant evidence is admissible unless prohibited by another rule, statute, or the constitution. Evid.R. 402. Evidence which is not relevant is not admissible. Evid.R. 402.

Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A).

We begin with the State Exhibit 134, a .308 rifle the state used as demonstrative evidence. This was a rifle purchased during a controlled buy in Portage County. As .308 rifles are not common, Portage County contacted Youngstown regarding the Repchic shooting. A Youngstown police officer testified that he went to Portage County to test-fire the weapon and retrieved it later for retesting by BCI. (Tr. 163, 166).

A BCI agent had concluded that the Portage County weapon was not the gun used to fire the cartridge found at the scene. (Tr. 315). He decided to conduct his own test-fire of the Portage County .308 rifle with the exact brand of ammunition used in the shooting to see if the officer's use of a different brand of ammunition affected the breech pattern. (Tr. 315). The second test-fire also came back as negative for a match. (Tr. 316).

As the rifle was not related to this shooting, appellant urges that it was irrelevant and prejudicial. Initially, we note that no objection was entered when the .308 was first introduced during the testimony of the officer who test-fired the weapon. (Tr. 162-166). By the time an objection was entered during the BCI agent's introduction of the .308,

the item had already been introduced without objection. (Tr. 314). Error may not be predicated upon a ruling that admits evidence unless the party opposing the admission timely objects. Evid.R. 103(A)(1). We note that the matter was not raised by the defense in the motion in limine. The court did address the matter in its judgment entry thereon (as it was raised in the state's response), but a motion in limine or ruling thereon does not preserve an objection.

Regardless, demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 401, it is substantially similar to the object or occurrence that it is intended to represent, and it is not violative of Evid.R. 403. *State v. Jones,* 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 82. The admission of demonstrative evidence is within the trial court's sound discretion. *State v. Herring,* 94 Ohio St.3d 246, 255, 762 N.E.2d 940 (2002); *State v. Palmer,* 80 Ohio St.3d 543, 564-566, 687 N.E.2d 685 (1997).

Thus, the Supreme Court has permitted the state to introduce a .22 caliber revolver as a demonstrative exhibit where the jury was instructed that the gun was similar to but not the actual gun used in the murder and was advised that it was being used for the limited purpose to show that the method of firing entailed pulling back the hammer to cock the gun. *Id.* at 565-566 (with an instruction that the energy needed to pull the trigger may be different). The Court stated that the

handgun was relevant to intent, purpose, prior calculation design, and absence of mistake or accident. *Id.* at 566, upholding this court's decision in *State v. Palmer,* 7th Dist. No. 89-B-28 (Aug. 29, 1996) (where we held that state can introduce a handgun as a "model" to show that the type of gun used in the murder required a certain process to be fired to refute a claim that the gun accidentally fired).

Here, a .308 firearm was used to shoot the victims. A fired .308 cartridge was found in the middle of the street where witnesses put the vehicle from which the shots were fired. An unfired .308 cartridge was found in appellant's house, which had extractor marks said to match those on the fired cartridge.

In maintaining his defense that he was not aware of the plan to shoot at Piru or OB, appellant insisted that he did not see the gun until Aubrey Toney pulled it out just prior to shooting. (DVD Tr. 105). The state wanted to rebut this claim by showing how big a .308 rifle is in order to suggest that appellant had to have seen the gun being transferred from the small car into the Durango or had to see it in the front of the Durango.

Testimony established that a .308 rifle is a rare weapon to encounter on the streets; it was said to be shoulder-fired, high-powered, and at least semi-automatic. (Tr. 152-153, 310, 312, 318, 512). A detective who

owned a .308 rifle described the ammunition as big caliber or big bore that is very loud and very powerful with a lot of powder and a big "blowup" and which was mostly used in light machine guns, big hunting rifles, or police sniper rifles. (Tr. 152-153). Witnesses testified to a large amount of gun smoke around the Durango during the shooting.

The BCI agent recited the FBI-generated list of firearms that could fire the cartridge, and the type in State Exhibit 34 was on the list. (Tr. 313, 316). He stated that all of the rifles on the list eject the cartridge and reload another upon firing. (Tr. 318-319). He noted that the cartridge showed fluted chamber marks which occur only with a semiautomatic or above and not with a bolt action or manual ejection firearm. (Tr. 310).

Moreover, appellant admitted that Aubrey Toney previously had a "big ass" .308 at appellant's house and that Aubrey Toney left the .308 cartridge there. (DVD Tr. 16, 35). He indicated that Aubrey Toney was "clacking" the metal parts of his gun one night, which suggests this is when the unfired cartridge was cycled through the gun.

Appellant also variously described the gun as "pretty big," "big ass," and "pretty fucking long." (DVD Tr. 60). Appellant stated that he did not know that "big motherfucker" was wedged in the front of the Durango when he got in. (DVD Tr. 88). He also stated that Aubrey Toney had to wrestle with the gun to bring it up to the car window. (DVD Tr. 122). In

addition, he mentioned that Toney rested it all the way out between the mirror and the door.

The trial court could reasonably find that State Exhibit 134 was substantially similar to the .308 rifle used in the shooting. In order to show just how big a .308 rifle is and thus help rebut appellant's defense, the state could properly admit a .308 rifle. The state wanted to show that appellant knew the gun was in the vehicle and that they switched from a small car to a large SUV specifically to utilize the large gun in their pursuit of Piru and OB. The state notes that the laughter heard by witnesses coming from the Durango as it drove down the road just before the shooting combined with appellant's statement that Aubrey Toney had to wrestle with the gun to get it out the window suggests that they were laughing about Aubrey Toney's struggle with the weapon.

We have viewed the .308 rifle identified as State Exhibit 134. It is nearly three and a half feet in length. Besides being very long, it is bulky. The butt of the stock is wide. Even wider is the distance from the bottom of the grip to the top of the barrel, which appears to span more than 8 inches. Upon seeing such a representation of a .308 rifle, a person can tend to disbelieve appellant's claim that he did not notice the gun in the front of the Durango until Aubrey Toney pulled it out seconds before shooting or that he did not see Aubrey Toney load the

rifle into the Durango after he borrowed it. Thus, it was relevant. *See, e.g., Jones,* 135 Ohio St.3d 10 at ¶ 84-96.

There is no indication that the introduction of the .308 rifle as demonstrative evidence would confuse or mislead the jury. *See, e.g., Jones,* 135 Ohio St.3d 10 at ¶ 110. A police officer, a detective, and a BCI agent all testified that State Exhibit 134 was not the actual .308 rifle used in the shooting. (Tr. 167, 315-316, 513). And, the court gave a demonstrative evidence instruction *formulated by both sides,* which explained that demonstrative evidence is an object, picture, model, or other device intended to clarify or qualify facts for the jury, that such evidence is merely an aid in understanding certain facts, and that it is up to the jury to decide what weight to give such evidence. (Tr. 560, 651-652). Also notable here is that this particular piece of demonstrative evidence was actually scientifically excluded as the murder weapon by the state's witnesses, lessening any confusion and adding to background investigation relevance.

Finally, evidence against a defendant is meant to be prejudicial; it is only unfair prejudice that concerns the court and only unfair prejudice that can substantially outweigh the probative value. *See* Evid.R. 403(A). The probative value of the demonstrative evidence here was high. We find that the trial judge could reasonably conclude that the probative value of the demonstrative evidence was not substantially

outweighed by the danger of unfair prejudice. We refuse to substitute our judgment for that of the trial court on this matter as the decision was not unreasonable, arbitrary, or unconscionable. *See, e.g., Jones,* 135 Ohio St.3d 10 at ¶82; *Herring,* 94 Ohio St.3d at 255.

We now turn to the introduction of the evidence relating to guns and drugs (besides the unfired .308 cartridge for which no argument is or could be made). An officer testified that, during the search of appellant's residence at 537 Garfield Street, he discovered the following items in the following locations: from a cigar box, a pipe, suspected cocaine, and live and spent cartridges; from beside the living room couch, a 12-gauge shotgun; from the garage rafters, two magazines; from the living room hutch, two bullet proof vests; from the top of the refrigerator, a .9mm; from the attic, a .30 caliber, a .9mm, a 12-gauge shotgun, and a bag containing ammunition and a pistol magazine. (Tr. 244-245).

The officer identified photographs depicting this evidence, and the evidence was then itself admitted. (Tr. 246-257). A detective testified that he recovered the following items from the kitchen during the search: crack cocaine, a digital scale, and black Ziploc baggies. (Tr. 457). He also recovered marijuana on appellant's person during the arrest. (Tr. 458).

Objections were entered during the testimony of these two witnesses. (Tr. 244, 456, 458). As the officer began to testify about these items, the defense objected by referring back to the mid-trial motion in limine which had been overruled. (Tr. 244). The motion in limine asked to prohibit the admission of firearms, ammunition, and cocaine recovered in the search and not used in the murder. The motion raised relevance and degree of prejudice and argued that the state was trying to convict him by association with nefarious objects. (03/28/12 Motion In Limine).

The state responded that the police were told that appellant's house is where Aubrey Toney and appellant kept their guns and a .308 cartridge was in fact found there. The state argued that the evidence of guns and ammunition is relevant to appellant being the provider of the murder weapon, besides allowing his house to be used for its storage. As for the drugs, the state responded that the discovery of 8 packets of crack cocaine individually wrapped for sale on appellant's table put into question appellant's claim that he drove to Philadelphia Avenue to meet with a marijuana dealer so that they could drive around and smoke marijuana.

The court's judgment entry denying the motion in limine concluded that the opening statement of the defense raised the issue of appellant looking for drugs, thus opening the door for the state to rebut that story with the introduction of the cocaine. (*See* Tr. 37). As to the guns, the

court agreed that they could be admitted to rebut appellant's claims that he was not part of any dispute, that he had no idea what was going on, and that he was merely a witness with no intention of harming anyone. (03/29/12 J.E.).

Appellant urges that since he was not charged with offenses related to these items, they were irrelevant, overly prejudicial, and improper other acts evidence. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

It can also be used to respond to arguments already raised, such as to bolster credibility after an attack thereon or to delve into a line of inquiry already raised. *See, e.g., State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 75-78. The state contends that the evidence from the search was not used to show appellant's character but was used to outline the methods of investigation to establish that the police conducted a thorough investigation. The state also notes that the relevancy test does not require the evidence to directly prove an element of the offense. *See State v. Tapscott,* 7th Dist. No. 11MA26, 2012-Ohio-4213, ¶ 23.

As to the bulletproof vests, appellant told police that Aubrey Toney wore a bulletproof vest for protection, that he left it at appellant's house, and that he sometimes forgot to wear it when they got high. (DVD Tr. 114). Appellant stated that Aubrey Toney had a feud with Piru and OB and insisted that he was not involved in the feud. As Toney was said to wear a vest as protection against the feud, the fact that two vests were found in appellant's house is pertinent to the question of whether appellant was affected by or involved in the feud. It is not unfairly prejudicial or improper other acts evidence. It confirms a statement of appellant while also rebutting a key claim of his defense and constitutes evidence of knowledge of the feud and even preparation for involvement in that feud.

As for the guns and ammunition found in appellant's house, these items were not alleged to be used in the shooting. The Supreme Court has suggested that other firearms are not admissible merely to show a defendant had access to guns where those guns are not said to be the murder weapon. *State v. Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 107. That Court did find some merit to the state's contention that a cache of weapons found in a suspect's home can be introduced to show familiarity with weapons in a case where the defendant claimed that he accidentally pulled the trigger on a different weapon. *Id.* at ¶ 110. The Court alternatively stated that the admission

would have been harmless due to overwhelming evidence of appellant's guilt. *Id.* at ¶ 111 (a death penalty case).

Here, the guns and ammunition were found in appellant's house where a .308 cartridge was also discovered. Appellant admitted that he was the driver during the shooting with a .308 and admitted that said rifle and its ammunition had previously been in his house. The ammunition magazines found in the rafters of appellant's garage bolstered the credibility of Aubrey Toney's male cousin, who told police that the murder weapon was likely in the rafters of appellant's garage. That witness told police that Aubrey Toney and appellant both kept guns at appellant's house. (Tr. 488-489). The guns and related evidence tend to show that appellant supplied or at least stored the murder weapon in which case he would be more aware of its removal prior to the shooting rather than a mere innocent driver.

Moreover, appellant admitted that his house was Aubrey Toney's "safe spot" when he was "beefing." (DVD Tr. 56). He had a security system set up on a monitor showing four views of the exterior of his house. (Tr. 491). Notably, the shotgun lying in the open right next to appellant's living room couch, the same room containing Aubrey Toney's bulletproof vest, the security monitors, and the unfired .308 cartridge (with extractor marks matching those made by the murder weapon), could be seen as evidence that appellant was involved in the feud at

issue due to his friendship with Aubrey Toney. And, the choosing of this gun over the other available weapons could show intent to kill as opposed to scare, especially considering how unwieldy the gun is and in combination with the switching to a larger vehicle prior to the shooting.

Although alone each of these theories may be insufficient support for the admission of the guns and ammunition, using a combination of all of the elements existing here, we conclude that the guns and ammunition found in the same house as the .308 cartridge were relevant and admissible to rebut appellant's defense, which revolved a claim that he was not involved in the shooter's feud with Piru and OB and to show that he had a plan in place to protect himself against the feud and/or further it. The probative value of this evidence was not substantially outweighed by dangers of unfair prejudice, especially considering that appellant had admitted that the .308 was present in his house before the shooting (and that Aubrey Toney even utilized it in his house in a manner that produced a "clacking" of metal sound).

The drugs and paraphernalia found in appellant's house tend to rebut appellant's claim that he was driving around Philadelphia Avenue, not in search of the red Cadillac, but in order to meet a marijuana dealer whom he allegedly needed Aubrey Toney to find for him because he could not find any himself. (DVD Tr. 101-102). Notably, Aubrey

Toney's cousin testified that he originally met appellant one night, when he and Aubrey Toney went to the house on Garfield to *buy marijuana off appellant.* (Tr. 379-380).

Appellant insisted to police that his point in driving around with Aubrey Toney was to drink, do pills that he already possessed, find marijuana from Toney's dealer, and then return to appellant's house to watch a game together. That drugs and tools for not only drug-using but also for drug-distributing were found in his house is relevant and probative to an evaluation of the credibility of his defensive claims.

Appellant made these claims in his statement to police, which was introduced by the state at trial. These claims were also made in the defense's opening statement. The Supreme Court has concluded that after the defense raised the subject of defendant's drug use in opening statements, "the topic became open to all relevant inquiry in the discretion of the trial court". *State v. Kamel,* 12 Ohio St.3d 306, 312, 466 N.E.2d 860 (1984). Under the particular facts of this case, we overrule the argument regarding the admission of the drugs discovered during the search of appellant's residence. This assignment of error is overruled.

*Agee, supra*, at ¶ 22-55.

{¶61} In order to overcome the *res judicata* bar, Appellant offers the affidavits of attorneys Cartwright-Jones and Gentile, which state that the guns were placed on

the state's table after identification in close proximity to the jury. (Cartwright-Jones Aff., ¶ 4.) Cartwright-Jones also states that the assistant prosecutor "slowly walked from the table to the witness stand, displaying the weapon to the jury as he passed the jury box," and that these actions occurred despite "strenuous, repeated objections" from the defense. *Id.* The Cartwright-Jones and Gentile affidavits also aver that Tequi Clinkscale was placed in handcuffs and flanked by two Deputy Sheriff's during her testimony. *Id.* at ¶ 3.

**{¶62}** As stated above, "[a] postconviction petition may also be dismissed without a hearing where the claims are barred by res judicata." *West, supra*, at ¶ 24. *Res judicata* bars any claim or defense that was raised or could have been raised in an earlier proceeding. See *Perry*, 10 Ohio St.2d at 180-181. Further, "[t]he doctrine of res judicata excludes subsequent actions or postconviction petitions involving the same legal theory of recovery as the previous action or petition as well as claims which could have been presented in the first action or postconviction petition." *State v. Sawyer*, 8th Dist. No. 91946, 2009-Ohio-2391, ¶ 19, citing *Cole*, at syllabus.

**{¶63}** In regard to Appellant's current argument, the record contains the trial court's statement, made outside of the hearing of the jury, concerning the State's use of the firearms found inside Appellant's mother's house and the .308 rifle used for demonstrative purposes only:

On the record. I just want the record to reflect that the guns that were seized at the residence in this matter were only being displayed to the jury while they were being identified, and that the gun that was testified

to was only displayed to the jury while the person from BCI testified about it when it was taken from Portage County to establish the chain of custody. It was not taken out of the box by the officer; correct?

(Trial Tr., p. 426.) Both parties agreed that this statement portrayed an accurate summary of events. The jury was later instructed on the use of demonstrative evidence. (Trial Tr., pp. 651-652.) Thus, the trial record contains evidence that the state displayed multiple firearms to the jury and used the .308 rifle for demonstrative purposes. Appellant has failed to offer relevant evidence found outside of the record to overcome *res judicata*.

{¶64} This Court has previously concluded that the .308 caliber rifle (Exhibit 134) was properly introduced as demonstrative evidence, and the drugs, guns, and ammunition found in the same house as the .308 cartridge were relevant and admissible to rebut Appellant's defense. There is no reason why a constitutional challenge could and should not have been raised on direct appeal. Even the Cartwright-Jones affidavit clearly states that there were strenuous and repeated objections during trial regarding the display of the guns.

{¶65} Finally, following Tequi Clinkscale's testimony, defense moved for a mistrial because she was handcuffed in front of the jury. (Trial Tr., p. 109.) The trial court denied the motion. (Trial Tr., p. 111.) In support, the trial court made the following findings on the record:

The Court, first of all, will note for the record that not only was the witness evasive in her answers, as the record will reflect, the Court

recessed, allowing her to refresh her memory, and she came back and was evasive again, as well as raised her voice in speaking to the Court and counsel. The Court will not permit any witness or anyone to disrupt proceedings in this courtroom. The Court took the appropriate actions necessary to ensure the safety of everyone present in the courtroom. Therefore, the Defendant's motion is overruled.

The Court will, however, issue an instruction to the jury, which I believe has been reviewed by the parties, ensuring that the jury is ensured that they are not to take -- any actions taken against the witness, that they are not to hold them against the Defendant.

The Court is also going to issue instructions to the jury about other witnesses that may appear in handcuffs due to their lack of -- lack of willingness to testify in this matter about statements previously given to the police.

(Trial Tr., pp. 110-112.) The trial court then properly instructed the jury that its actions, taken against Clinkscale, were not to be held against Defendant:

Next, ladies and gentlemen, yesterday you observed the Court having to unfortunately order the deputies to handcuff a witness. The Court informs the jury that after the witness began her testimony and was only giving evasive answers, the Court ordered the witness to review her videotaped statement to refresh her memory. The Court then explained

to the witness the importance of testifying accurately and completely. The Court cautioned the witness not to be disrespectful or disrupt these proceedings. Upon her return to the Court, the witness continued to answer the questions evasively and began to disrupt the Court in an attempt to engage the Court in acrimonious colloquy.

It is the responsibility of the Court to maintain the proper decorum at all times and to maintain the safety of everyone in the courtroom. The Court instructs the jury that any action taken by the Court against that witness is, in no way, to be held against the defense or the Defendant Kevin Agee.

The Court is further going to instruct you that there may be other witnesses that prove to be difficult, and that this action or similar actions may have to be taken against those witnesses. I will once again give you an instruction that if that happens, you are in no way to infer any actions taken by the Court to be held against the Defendant or the defense.

(Trial Tr., pp. 117-119.)

{¶66} Evidence that Tequi Clinkscale was placed in handcuffs during her testimony is clearly contained within the trial record. Yet again, Appellant has failed to offer relevant evidence found outside of the record to overcome *res judicata*. Therefore, Appellant's third claim for relief is entirely barred by *res judicata*, because he has failed to offer new evidence and had the ability to have raised his

constitutional claims on direct appeal. Appellant's third assignment of error is not well-taken and is overruled.

### Fifth Assignment of Error

The trial court violated Kevin Agee's statutory and due process rights to meaningful consideration of the claims raised in his amended petition when it disposed of the first three grounds for relief on the basis of factual findings that contradict the record, and when it overlooked the fourth ground for relief.

{¶67} In Appellant's fifth assignment of error, he argues that he was denied meaningful review of his petition because the trial court relied on errant facts to dismiss his first three assignments of error, and failed entirely to address his fourth assignment of error, which contained a challenge to the trial court's ruling on the motion to suppress. The trial court's failure to address the fourth assignment of error, predicated on the trial court's denial of the motion to suppress, has been previously addressed.

{¶68} As to his claim that the trial court made certain misstatements of fact in deciding Appellant's petition, he appears to be correct. With respect to the first ground for relief, the trial court stated Appellant argued in his amended petition that Appellant remembered an Einstein quotation because his uncle was in jail at the same time as Appellant. This argument was not made in the amended petition. The trial court concluded that "[Appellant] only remembered [the Einstein quote] because his uncle – who was in jail with him – showed him the quote is unrealistic and

unbelievable." (6/17/14 J.E., p. 2.) Appellant testified at the August 25, 2011 hearing that he posted the quotation in his cell and read it every day. Consequently, the trial court's findings with respect to the Einstein quotation appear to be made in error.

{¶69} With respect to the second ground for relief, Appellant relies on the trial court's observation that the alleged discrepancy between Exhibits 103 and 113 "was litigated and briefed prior to trial." (6/17/14 J.E., p. 3.) In fact, the alleged discrepancy was raised for the first time in the motion for new trial. Accordingly, the trial court mistakenly concluded that the matter had been resolved before trial.

{¶70} With respect to the third ground for relief, Appellant relies upon the trial court's statement that "the weapons found at Agee's house and the .308 rifle were not displayed in plain sight of the jury. The .308 rifle was not taken out of the box and displayed to the jury." (6/17/14 J.E., pp. 3-4.) This, too, contradicts the trial record.

{¶71} Although all of the foregoing statements by the trial court in the June 17, 2014 judgment entry were made in error, this does not impact our determination that Appellant failed to support the claims in his amended petition with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief, as we have fully discussed in our Opinion in this matter. None of these misstatements aids Appellant's cause or impacts on the law to be applied. Despite these minor errors, the trial court reached the correct conclusion regarding Appellant's claims. Accordingly, Appellant's fifth assignment of error is without merit and is overruled.

<u>Sixth Assignment of Error</u>

The trial court abused its discretion in denying Kevin Agee's amended petition because, even if none of the grounds for relief warrant relief individually, the cumulative effect of the errors and omissions asserted in the amended petition was prejudicial and denied Kevin's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution.

**{¶72}** The cumulative error doctrine provides that a conviction can be reversed where the cumulative effect of trial errors deprives the defendant of the constitutional right to a fair trial, even though each of the instances of error does not individually constitute grounds for reversal. See *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). The doctrine is inapplicable where Appellant fails to establish multiple instances of error. See *Id.* Further, this Court has stated that the cumulative error doctrine is inapplicable where cumulative errors are harmless beyond a reasonable doubt. See *State v. Bell*, 7th Dist. No. 06 MA 189, 2008-Ohio-3959, ¶ 180, quoting *State v. Anderson*, 7th Dist. No. 03 MA 252, 2006-Ohio-4618, at ¶ 80. And "[t]he Supreme Court [of Ohio] has held that it is not enough to simply 'intone the phrase cumulative error.' " *State v. Young*, 7th Dist. No. 07 MA 120, 2008-Ohio-5046, ¶ 65, quoting *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4843, ¶ 197. "Thus, where an appellant raises the doctrine without further analysis, the assignment of error has been held to lack substance." *Young, supra*, at ¶ 65, citing *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008 ¶ 103.

**{¶73}** Appellant contends that, "[h]ere, the multiple instances of counsel's deficient performance involving [Appellant's] TBI and the discrepancy between Exhibits 103 and 113, the State's overreaching in obtaining [Appellant's] statement, and the prejudicial impact of the court's rulings described in the third ground combined to deprive [Appellant] of the fair trial the Constitution promised him." (Appellant's Brf., p. 32.)  Appellant has invoked the phrase "cumulative error," but provides no argument in support of his claim.  Further, only one of Appellant's assignments have revealed even harmless error.  Therefore, the cumulative error doctrine clearly does not apply.  Accordingly, Appellant's sixth assignment of error is not well taken and is overruled.

## Conclusion

**{¶74}** Appellant has failed to offer evidence *dehors* the record in support of his right to counsel and due process claims regarding the appointment of a neuropsychologist and/or neurologist, which could have been raised on direct appeal. In the alternative, Appellant has failed to offer evidentiary material setting forth sufficient operative facts to demonstrate a reasonable probability that a neurological expert would have aided his defense, and that the denial of expert assistance resulted in an unfair trial.  Accordingly, Appellant's first assignment of error predicated upon ineffective assistance of counsel is overruled.

**{¶75}** Appellant has likewise failed to offer evidentiary material setting forth sufficient operative facts to demonstrate that his confession was neither knowing nor

voluntary. Accordingly, Appellant's fourth assignment of error based on the trial court's judgment entry denying the motion to suppress is overruled.

{¶76} With respect to the alleged discrepancy of the evidence, Appellant could have raised his constitutional challenge to his trial counsel's failure to raise the evidentiary issue on direct appeal, and, as a consequence, his second ground for relief is barred by *res judicata*. Even assuming that Appellant provided new evidence to overcome the procedural bar, he has failed to cite evidentiary material setting forth sufficient operative facts to demonstrate that the round depicted in Exhibit 103 is not the round marked Exhibit 113. Therefore, his second assignment of error is overruled.

{¶77} Similarly, Appellant's third claim for relief, based on the admission of the guns at trial, display of the rifle during the state's closing argument, and the handcuffing of a witness during her testimony, is barred by *res judicata*. Appellant has failed to offer new evidence and it is evident his constitutional claims could have been raised on direct appeal. Thus, Appellant's third assignment of error is overruled.

{¶78} Appellant's fifth assignment of error is based upon numerous minor factual errors that do not impact the decision in this matter and the failure of the trial court to analyze his fourth claim for relief in the judgment entry denying his amended postconviction petition. Despite the factual errors and the omission, the trial court, nonetheless, reached the correct conclusion regarding Appellant's claims. As a consequence, his fifth assignment of error is overruled.

{¶79} Finally, as we find no error has occurred that even arguably rises to the level of harmless error, Appellant's sixth assignment of error predicated upon cumulative error is overruled. Accordingly, the judgment of the trial court is hereby affirmed.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.